# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

JUNHUI JIANG, Individually and on Behalf of All Others Similarly Situated,

          Plaintiff,

    v.

BLUECITY HOLDINGS LIMITED, BAOLI MA, ZHIYONG (BEN) LI, ZHE WEI, WEI YING, COLLEEN A. DE VRIES, AMTD GLOBAL MARKETS LIMITED, LOOP CAPITAL MARKETS LLC, TIGER BROKERS (NZ) LIMITED, PRIME NUMBER CAPITAL LLC, R. F. LAFFERTY & CO., INC., and COGENCY GLOBAL INC.,

          Defendants.

Case No. 1:21-cv-04044-FB-CLP

<u>JURY TRIAL DEMANDED</u>

<u>CLASS ACTION</u>

# AMENDED COMPLAINT FOR VIOLATIONS
# OF THE SECURITIES ACT OF 1933

Lead Plaintiffs Hui Yan Huang and Shiyuan Zhu ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, Court-appointed Lead Counsel for the proposed class, for Plaintiffs' complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding BlueCity Holdings Limited ("BlueCity" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Plaintiffs bring this federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants (defined herein), who purchased BlueCity American Depositary Shares ("ADSs" or "shares") pursuant and/or traceable to the Company's Registration Statement and Prospectus (together, the "Offering Documents") issued in connection with the Company's initial public offering conducted on or about July 8, 2020 (the "IPO" or the "Offering").  This Complaint seeks to recover compensable damages caused by Defendants' violations of the securities laws and to pursue remedies under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act").

2.      The action assets strict-liability and negligence claims under Sections 11, 12(a)(2), and 15 of the Securities Act, which arise from BlueCity's materially misleading Offering

Documents issued in connection with the IPO, against (1) BlueCity; (2) certain of BlueCity's senior executives and directors who signed the Registration Statement in connection with the offering; and (3) the offering's Underwriters. The Offering Documents were materially misleading because they failed to disclose the People's Republic of China (PRC) Government's crackdown on LGBTQ content online and in the media, a trend that began prior to the IPO and continued after the IPO, damaging BlueCity's business and slowing its growth. For all claims stated herein, Plaintiffs expressly disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

3.     BlueCity operates a platform for the LGBTQ—lesbian, gay, bisexual, transgender, and queer (or questioning)—community, primarily in China. BlueCity's mobile dating application, Blued, also offers interactive livestreaming. The Company also provides other products, including online health consulting, online pharmacy, and assisted reproductive technology services.

4.     On July 8, 2020, BlueCity conducted its IPO pursuant to the Offering Documents, issuing 5.3 million of the Company's ADSs to the public at the Offering price of $16.00 per ADS for approximate proceeds of $78.9 million to the Company before expenses and after applicable underwriting discounts and commissions. The Underwriters (defined below) earned approximately $6 million in commissions from the IPO.

5.     The Offering Documents did not present an accurate picture of the PRC Government's regulation of LGBTQ content, which had begun to tighten to the point that, by the time of the IPO, simply using the word "gay" on the internet was considered obscene and subject to Government sanction. The Offering Documents therefore painted a misleadingly rosy picture of BlueCity's business prospects as a gay dating app based in China. While the Offering

Documents touted the ability of BlueCity to function as a gateway for the "'coming out journey" of the LGBTQ population, encouraging them to be themselves," they failed to disclose that there had been a significant tightening of the PRC Government's rules restricting LGBTQ content online and in the media. These restrictions significantly affected BlueCity's business at the time of the IPO.

6. Indeed, by the time of the IPO, the PRC Government had taken the view that ***gay content itself*** is "obscenity" worthy of being censored or banned from the internet and airwaves. For example, the PRC Government has recently banned homosexual content from TV entirely – calling it "obscene" – and has shut down nearly every major gay dating app operating in China. As a result of the tightening PRC Government censorship, many in China's LGBTQ community do not feel safe revealing their sexuality or signing up to use BlueCity's products.

7. In fact, while BlueCity's English-language Offering Documents proclaim Blued to be the "Largest Online LGBTQ Community" and use the word "gay" freely throughout, the Chinese-language version of Blued does not use the word "gay" at all – instead using terms like "friends with shared interests" and "vertical groups" – out of fear of Government sanctions. Moreover, the PRC Government's new restrictions on LGBTQ content has forced BlueCity to assume skyrocketing compliance costs associated with Government censorship, to downplay its core function as a dating app so as not to appear too similar to the other gay dating apps that have been shuttered in recent years, and to scramble to find other, more politically palatable lines of business in the Government-approved health space, all to avoid being shut down by the PRC Government.

8.    To put it simply, investors were not told that they were investing in a gay dating app in a country where it was no longer safe to even label the product as such.  This was a trend that needed to be, but was not, disclosed.

9.    Facing increasing levels of regulatory scrutiny and the building pressures of running a gay dating app in a country whose government viewed gay content as obscene and therefore at risk of being shut down at any time, Defendants rushed the IPO to market before conditions could deteriorate further.

10.    None of the information in ¶¶5-7 was included in the Offering Documents.  Instead, the Offering Documents told investors to rely on the Offering Documents only, and not on any outside information.

11.    Against this backdrop, BlueCity raised money from investors, hyping old and dying business lines as new and promising.  They also touted the purportedly fast-growing revenues from its "recently launched" dating-related membership services at the exact time that the Company was scrambling to distance itself from – not double down on – being a gay dating app.

12.    BlueCity and its insiders cashed out, but unsuspecting investors were left holding the bag.  As the PRC Government continued to tighten its grip on LGBTQ content and shut down nearly every gay dating app in China, fear among BlueCity's users and potential users mounted, costs skyrocketed, and the value of BlueCity's ADSs plummeted, falling from its initial price of $16.00 to a closing price of $7.04 on July 19, 2021, when this lawsuit was filed, to a current price of less than $1.50.

13.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of BlueCity's ADSs, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v).

16.     Venue is proper in this Judicial District pursuant to Section 28 U.S.C. § 1391(b) as the alleged misleading public filings and press releases entered this district.

17.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

18.     Plaintiffs, as set forth in their certifications, incorporated by reference herein, acquired BlueCity ADSs pursuant and/or traceable to the Offering Documents issued in connection with the IPO, and suffered damages as a result of the securities law violations and false or misleading statements or material omissions alleged herein.

19.     Defendant BlueCity is a Cayman Islands offshore holding company with principal executive offices located at Block 2 Tower B Room 028, No. 22 Pingguo Shequ, Bai Zi Wan Road, Chaoyang District, Beijing 100022, People's Republic of China.  The Company's ADSs trade on the NASDAQ under the ticker symbol "BLCT."

20.     Defendant Baoli Ma ("Ma") has served as BlueCity's Chairman of the Board of Directors and Chief Executive Officer at all relevant times.  Ma signed or authorized the signing

of the Registration Statement filed with the SEC.  Defendant Ma is widely known, and referred to here, under the alias "Geng Le."

21.    Defendant Zhiyong (Ben) Li ("Li") has served as BlueCity's Chief Financial Officer at all relevant times.  Li signed or authorized the signing of the Registration Statement filed with the SEC.

22.    Defendant Zhe Wei ("Wei") served as a Director of BlueCity at the time of the IPO. Wei signed or authorized the signing of the Registration Statement filed with the SEC.

23.    Defendant Wei Ying ("Ying") served as a Director of BlueCity at the time of the IPO.  Ying signed or authorized the signing of the Registration Statement filed with the SEC.

24.    Defendants Ma, Li, Wei, and Ying are sometimes referred to herein collectively as the "Director Defendants."

25.    Each of the Director Defendants:

a.   directly participated in the management of the Company;

b.   was directly involved in the day-to-day operations of the Company at the highest levels;

c.   was privy to confidential proprietary information concerning the Company and its business and operations;

d.   was directly or indirectly involved in drafting, producing, reviewing or disseminating the false and misleading statements and information alleged herein;

e.   was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f.   was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g.  approved or ratified these statements in violation of the federal securities laws.

26.     As directors, executive officers and/or major shareholders of the Company, the Director Defendants participated in the solicitation and sale of BlueCity ADSs in the IPO for their own benefit and the benefit of BlueCity.  The Director Defendants were key members of the IPO working group and executives of BlueCity who pitched investors to purchase the shares sold in the IPO, including in IPO road shows.

27.     BlueCity is liable for the acts of the Director Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

28.     Defendant Colleen A. De Vries ("De Vries") served as Senior Vice President on behalf of Defendant Cogency Global, the designated U.S. Representative of Defendant BlueCity, and reviewed, contributed to, and signed the Registration Statement.

29.     Defendant De Vries, collectively with the Director Defendants, are sometimes referred to herein as the "Individual Defendants."

30.     Each of the Individual Defendants participated in the preparation of and signed or authorized the signing of the Registration Statement (defined below) and/or an amendment thereto, and the issuance of the Registration Statement.

31.     Defendant AMTD Global Markets Limited ("AMTD") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents.

32.     Defendant Loop Capital Markets LLC ("Loop Capital") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents.  Loop Capital has offices in New York.

33.    Defendant Tiger Brokers (NZ) Limited ("Tiger Brokers") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents.

34.    Defendant Prime Number Capital LLC ("Prime Number") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents.  Prime Number has offices in New York in this District.

35.    Defendant R. F. Lafferty & Co., Inc. ("Lafferty") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents.  Lafferty has offices in New York.

36.    The Defendants named in ¶¶ 31-35 above are collectively referred to herein as the "Underwriter Defendants."

37.    The Underwriter Defendants agreed to purchase and sell BlueCity ADSs to the public as follows:

| Name | Number of Shares |
|---|---|
| AMTD Global Markets Limited | 2,960,050 |
| Loop Capital Markets LLC | 590,950 |
| Tiger Brokers (NZ) Limited | 1,590,000 |
| Prime Number Capital LLC | 132,500 |
| R. F. Lafferty & Co., Inc. | 26,500 |

38.    Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Offering Documents.  The Underwriter Defendants' failure to conduct adequate due diligence investigations was a substantial factor leading to the harm complained of herein.

39.     The Underwriter Defendants are primarily investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities. As the underwriters of the Offering, the Underwriter Defendants earned lucrative underwriting fees as a result of their participation in the Offering.

40.     In addition, the Underwriter Defendants met with potential investors and presented highly favorable, but materially incorrect and/or misleading, information about the Company, its business, products, plans, and financial prospects and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

41.     Representatives of the Underwriter Defendants also assisted the Company and Individual Defendants with planning the Offering. They further purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

42.     In addition to having access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to the Company's lawyers, management, directors, and top executives to determine: (1) the strategy to best accomplish the Offering; (2) the terms of the Offering, including the price at which the Company's ADSs would be sold; (3) the language to be used in the Offering Documents; (4) what disclosures about the Company would be made in the Offering Documents; and (5) what responses would be made to the SEC in connection with its review of the Offering Documents. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and the

Company's management and top executives, at a minimum, the Underwriter Defendants should have known of the Company's undisclosed existing problems and worrying trends and the material misstatements and omissions contained in the Offering Documents, as detailed herein.

43.     The Underwriter Defendants also demanded and obtained an agreement from BlueCity that the Company would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.

44.     Defendant Cogency Global was BlueCity's authorized U.S. representative for purposes of the IPO.  Defendant De Vries, who signed the Registration Statement, was an employee of Defendant Cogency Global.  As a result, Defendant Cogency Global is liable for the securities law violations committed by Defendant De Vries in its capacity as employer and as a control person under the Securities Act.

45.     BlueCity, the Individual Defendants, the Underwriter Defendants, and Cogency Global are referred to herein, collectively, as the "Defendants."

## **DEFENDANTS' VIOLATIONS OF THE SECURITIES ACT**

**The BlueCity Story**

### *Danlan*

46.     After Defendant Geng Le launched Danlan, originally a personal blog entitled *The Light Blue Memories* that grew to become an online forum for LGBTQ content in China, it was shut down many times by both Government authorities and internet service providers.  Around 2007, though, Geng Le came up with a new way to secure Danlan's survival in the face of PRC Government surveillance and censorship.

47.     Geng Le's survival strategy was to link Danlan to the PRC Government's fight against HIV/AIDS.  In 2009, Geng Le changed Danlan's domain from ".com" to ".org," and reinvented the website as an organization dedicated to HIV/AIDS prevention.

48.     Geng Le later described how he came to see an opportunity to work with the state:

"We talked to Changping district's CDCP [Center for Disease Control and Prevention]. I said that I was the person in charge of the largest gay website in China and we hoped to help you [them] carry out HIV/AIDS prevention. Upon hearing this news, the leader at the center was delighted. He said, 'Geng Le, you came at the right moment. We have been looking for homosexual people, but we could not find any.'"

49.     Geng Le described his strategy this way:

"We need an angle from which the government notices our existence and supports us. If you talk about equality and rights for homosexual people, the government won't be happy; if you tell the government that you can help with HIV/AIDS prevention, the government will be very happy."

50.     Focusing on this narrow health mission made Danlan politically palatable to the PRC Government, allowing Danlan to grow into a website that hosted HIV/AIDS-related resources, as well as paid advertisements.  This strategy culminated on 2012 World Aids Day, when Geng Le shook the hand of Li Keqiang, the Vice Premier of China who would become Premier the following year.

51.     Danlan used the photograph of the handshake between Geng Le and Li Keqiang as a publicity instrument, hanging it on the wall as a symbolic endorsement from the PRC regime. Geng Le has remarked: "Who would take the risk of investing [in] Danlan had I not met Li Keqiang?"

### *BlueCity* **and its mobile dating app,** *Blued*

52.     Encouraged by the success of Danlan, Geng Le founded BlueCity in 2011 and launched the mobile dating app Blued in November 2012.  Assisted by the GPS technology built

into smartphones, the Blued app was initially similar to Western counterparts such as Grindr and Jack'd, which facilitate immediate encounters based on users' geographical proximity.

53.     Geng Le acknowledged that the original Blued app was a replica of Grindr and Jack'd: "I hired a few college students. I told them, 'Imitate Jack'd and make an exact copy.'"

54.     Facing political pushback, however, Blued diversified its product offerings substantially, positioning itself less as a dating app and more as a hub for LGBTQ entertainment and health.  Today, BlueCity operates an LGBTQ platform that includes the flagship mobile app Blued, with both dating and livestreaming functions, while also offering online health consulting and online pharmacy services.

55.     To maintain the trust of the PRC Government, Blued has had to position itself as a health education platform.  Blued's Head of Marketing explained:

> "Tall trees catch much wind. I don't know how many people are watching [us]. If we were a heterosexual app, or if we ranked second or third in this [gay social app] industry, we wouldn't work so cautiously. To perform anything, we need go beyond the government's standards."

56.     BlueCity has dedicated staff members whose duties are to approach various governmental departments on a daily basis in an effort to avoid being shut down, and BlueCity management has organized reading groups where employees pore over the speeches of President Xi Jinping, analyzing his rhetoric and predicting what it might mean in terms of BlueCity's survival.

57.     The foundations of Blued's business are only as secure as the tenuous and unpredictable relationship between Blued and the PRC Government.  "Blued, even today, can still run a business in China because it mainly positions itself as a health promotion platform, rather than a gay platform," said Lik Sam Chan, a communications professor at The Chinese University

of Hong Kong.  Professor Chan continued: "Blued diluted the sexual elements of its business to promote itself as a health promotion platform.. . . . It must, in order to survive."

58.    Blued has been called an exception to the rule that LGBTQ content online will inevitably draw the ire of the PRC censors.  One LGBTQ activist noted that the app – like its predecessor, Danlan – has survived by linking itself to HIV prevention, and added: "I think that's a very good surviving angle there. I just hope they don't get removed in the future."

59.    To mitigate its exposure to the harsh PRC laws and regulations on gay content, BlueCity has made efforts at international expansion in recent years, however, at the time of BlueCity's IPO, over 90% of the Company's total revenues came from within China.  The Offering Documents acknowledged that "[s]ubstantially all of our revenues are sourced from China."

60.    While the Offering Documents paint a rosy picture of Gang Le's one-man Danlan operation maturing into a "full suite of services empowering LGBTQ persons in all aspects of their daily lives," the sad reality is that the PRC Government's continuing efforts to censor and surveil the LGBTQ Community has frustrated BlueCity's ability to operate a successful business, by imposing runaway compliance costs, requiring self-censorship, foreclosing profitable services, and deterring would-be users.

61.    For example, while the cover of the English-language Prospectus touts BlueCity as the "Largest Online LGBTQ Community," the Chinese-language version of the Blued app – following a PRC Government crackdown in 2017 re-classifying homosexual content as obscenity alongside incest and sexual abuse – has removed all homosexuality-related terms, stating: "Blued is an interest-based social app advocating positive, healthy lifestyles and the public good."  Terms like gay and *tongzhi* have been removed from BlueCity's Chinese-language promotional materials, as well.

62.     The removal of the word "gay" from what is widely known as a gay dating app is indicative of the thoroughly-censored reality in which many members of China's LGBTQ community do not feel safe revealing their sexuality or using apps like Blued.  In fact, due to the PRC's escalating restrictions of the last few years, homosexual content is currently banned from television, online forums and message boards are constantly being reviewed by censors and removed, and scores of LGBTQ websites and dating apps have been shut down by the Government, both before and after BlueCity's IPO.

63.     As one commentator put it recently:

> ***Operating a dating app for LGBTQ+ communities in China is like walking a tightrope. In theory, it is not illegal. But if such a product crosses any red line — if it becomes too high-profile, too political or too careless about inappropriate content — the result can be immediate termination.*** Zank, a gay dating app with over 10 million registered users at the time, was taken down by regulators in 2017 for hosting pornographic content. Rela, a lesbian dating app with over 12 million users, was removed from app stores twice before it rebranded to "The L," removed all mentions of "lesbian" in its app store description and just called itself "a diverse community for women."

64.     That the PRC Government's censorship and control of the LGBTQ community has forced BlueCity to "walk a tightrope" – making BlueCity assume overwhelming compliance costs while preventing it from becoming too much like the numerous gay dating apps that have been shuttered in the recent past – has had a significant negative affect on BlueCity's business prospects.

65.     Investors were entitled to know the full extent of the PRC Government's crackdown on LGBTQ content – and to understand that there was a retrenchment taking place that would continue to have a material adverse effect on BlueCity's business going forward – before investing in a gay dating app based in China.

**The Undisclosed Trend: PRC Government Control of LGBTQ Content in the Media and Online Tightens Leading Up to BlueCity's IPO**

66.     In 2016, the PRC Government launched a crackdown on LGBTQ content online and in the media, as part of what the Government deemed "vulgar, immoral and unhealthy content."

67.     In March of 2016, the Government banned "abnormal sexual relations" on television, scrubbing all depictions of gay people from TV.

68.     On November 4, 2016, the Cyberspace Administration of China (CAC) released new Live Streaming Service Management Rules.  A month later, on December 2, 2016, the Ministry of Culture issued further regulations on cyber performances, known as the Online Performance Business Operation Management Rules.  Together, the new regulations added to the list of prohibited content, strengthened the censorship responsibilities of live streaming platforms and required live streaming service providers to verify the real identity of all performers.

69.     In April 2017, the Government shut down the popular gay dating app, Zank, which had operated for four years, accusing it of hosting pornographic and obscene content.

70.     Zank was the most well-known of a group of 18 apps (including another gay-focused app called BlueSky) that the Government removed in a coordinated purge.

71.     The following month, in May of 2017, the Government shut down the popular lesbian dating app, Rela, which had operated since 2012.

72.     In June of 2017, the China Netcasting Services Association (CNSA) released a new regulation categorizing homosexual content alongside incest, sexual deviancy, sexual assault, sexual abuse, and sexual violence as "vulgar," "obscene," and "pornographic."

73.     On November 9, 2017, the popular livestreaming app Peepla, known for its same-sex content, was shut down by the National Work Group for Combating Pornography and Illegal Publications (NWGCPIP), a member department of the CAC.  The crackdown against Peepla led to criminal charges and the arrests of several male streamers for lewd behavior.

74.     The censorship has continued to intensify, with thousands of websites, blogs and individual accounts being shut down, and internet platforms forced to hire legions of censors to do the Government's bidding.  "China's censorship of LGBTQ content will be ever more strict this year compared to last year," the Beijing LGBTQ Centre told the Financial Times in April of 2019.

**The Undisclosed Trend Continues Following BlueCity's IPO**

75.     In April of 2021, with President Xi Jinping urging a "national rejuvenation," the Government banned effeminate men from TV in a continued attempt by the Government to strengthen its grip over sexual minority groups in China.  The National Radio and TV Administration told broadcasters that they must "resolutely put an end to sissy men and other abnormal esthetics."  It used the term "niang pao," which means "girlie guns" — an offensive word used to describe effeminate men.

76.     The announcement also urged television programs to "vigorously promote excellent Chinese traditional culture, revolutionary culture and advanced socialist culture." Broadcasters were directed to ignore celebrities who threaten the Government's idea of social order.  Lynette Ong, professor of political science at the University of Toronto, told the BBC that these announcements were "evidence of the Party's ever encroaching role into the lives of ordinary people."  Similarly, Rana Mitter, a professor of Chinese politics at Oxford University, described the restrictions – which specifically targeted live streamers, TV personalities and pop stars – as more sustained and coordinated than previous efforts.

77.     Just a few months earlier, the WeChat accounts for LGBTQ student associations at top universities including Tsinghua and Peking were shut down.  WeChat displayed a message saying that these accounts had "violated regulations on the management of accounts offering public information service on the Chinese internet."

78.     But even in the midst of the crackdown, Geng Le continued to project optimism and downplay the mounting restrictions on LGBTQ content.  For example, in June 2021, Geng Le said that "Today, gay people live in a much better social environment—there's a dramatic change.  A lot of the young generation are quite happy with where they are and comfortable with their identity."

79.      In September of 2021, the messaging platform QQ – which is owned by the Chinese tech giant Tencent and has been described as "the closest thing to Snapchat in China" by the *Wall Street Journal* – banned the words "gay," "lesbian" and "LGBTQ."  When QQ users tried to search for these words, they received the message: "Use the Internet in a civil manner. Say no to harmful information."

80.     Finally, in late January 2022, the popular gay dating app Grindr disappeared from app stores in China, an event viewed as the first casualty of China's pre-Olympics internet purge.  The prior week, the Government announced the start of new efforts to regulate internet content in order to "rectify the chaos of bad behavior on the internet…and create a healthy and peaceful network…for netizens, especially minors."

81.     The disappearance of Grindr is widely seen as a logical continuation of the Government's years-long tightening of restrictions on LGBTQ content online.  Fortune Magazine reflected:

China's pre-Olympics campaign to step up policing of the internet and citizen behavior is part of a broader censorship push that will likely endure even after the Games end, experts say.

In the past five years, China's internet freedoms have regressed, even though the country seemed to be on an opposite trajectory throughout the early 2010s, says Zak Dychtwald, founder and CEO of Beijing-based consultancy Young China Group and author of *Young China: How the Restless Generation Will Change Their Country and the World*. As a result, netizens, especially young people, are more cautious now in what they post online. "We hear more and more of young people's self-censorship [online], and relating how their parents immediately [tell] them to [delete] a post if it toes the line. [These] small behavior changes can shift…national conversation and perception," he says.

The government's crackdown on internet content, apps, and free speech could grow much larger, Lucero [a fellow at Yale University's Paul Tsai China Center focused on Chinese technology law and policy] says, with anything that's perceived as too popular, too foreign, or if the party deems it threatening, to likely face growing censorship.

82.     Grindr's disappearance has added to the already palpable fear among many in the LGBTQ community that the Chinese Government is targeting them, and also possibly using LGBTQ apps and websites as a means of accessing their personal information.

83.     One LGBTQ activist explained: "If Grindr has to hand over my information to Chinese authorities, I would not feel comfortable using it.  In China, it's not uncommon for police [] to go on dating apps and arrest people for what they call 'soliciting sex.'"

84.     This fear is especially heightened because Chinese users of apps like Blued are required to complete real-name registration procedures pursuant to the notice jointly issued by the National Office of Anti-Pornography and Illegal Publication and other five authorities in August of 2018.

85.     The LGBTQ activist continued: "I would never publicly display my sexuality in China. It would put me in danger.  People are very discreet on the apps. They don't want to share photos or talk about their sexuality."

**BlueCity is Forced to Censor Itself, Assume Overwhelming Compliance Costs, and Curtail Profitable Services In Response to the PRC's Crackdown on LGBTQ Content**

### A. The Late 2016 Live Streaming Regulations Give Rise to a Censorship Division

86.    BlueCity has been forced to censor and surveil itself in response to the Government's tightening control of LGBTQ content online and in the media, materially increasing its costs of doing business.

87.    In January of 2016, Blued became the first gay dating platform to introduce live streaming.  While Blued has always prohibited pornography and obscenity in its Terms of Service, Blued allowed soft erotic displays such as the shirtless flexing of muscles and other suggestive displays of body parts for the first year of its live streaming function, which contributed to the rise of traffic on the Blued app.

88.    Following the new regulations promulgated by the Cyberspace Administration of China and the Ministry of Culture in November and December 2016, Blued was forced to make several major changes to its live streaming function.

89.    First, Blued narrowed the content that was permitted in its live streaming performances, banning the sort of soft erotic displays mentioned above.  Second, Blued set up a censorship division to monitor live streaming closely around the clock.  As many observers have noted, the costs of running 24/7 monitoring programs – which discipline all live streamers into dressing "decently" and talking "properly" while on camera – are enormous.

90.    The censorship division that grew out of the Government's 2016 live streaming restrictions has grown into a sprawling security function tasked with enforcing Blued's wide-ranging community regulations.  For example, Blued assigns each user "rainbow credits," which Blued deducts if the user violates any rules.  When a user loses credits, the user's profile faces more restrictions, the final stage of which is being frozen.  While Blued acknowledges that posting

politically sensitive remarks can result in a penalty of rainbow credits, users have complained that simply trying to organize a group activity can incur a penalty from the censorship division. (The shutdown of Rela is widely thought to have been retaliation for a group event that Rela organized in Shanghai in 2017.)

**B.  The June 2017 CNSA Guidelines Force Blued to Remove the Word "Gay"**

91.     The June 2017 CNSA Guidelines deeply unsettled Chinese gay dating apps, Blued included. The month after the CNSA revised its guidelines and categorized homosexual content alongside incest and sexual deviancy, Blued removed all homosexuality-related terms from the product statement on its website.

92.     In 2016, Blued's Chinese website had advertised itself as the "biggest gay portal website for Chinese people," and stated that: "Blued is a new and interesting gay software."

93.     Shortly after the 2017 guidelines, however, Blued's Chinese website changed the description to "Blued is an interest-based social app advocating positive, healthy lifestyles and the public good."

94.     Blued replaced terms like gay and *tongzhi* with disguised terms like "friends with shared interests" and "vertical groups." BlueCity's official company description is now "The World's Leading Interest-Based Social & Health Education Network." The term "vertical group" is a piece of marketing jargon describing a group of companies and customers that are interconnected around a specific niche.

95.     In fact, Blued added a lengthy description to its Chinese version which downplayed the app's connection to gay culture and replaced it with a commitment to gay health:

> Blued is a social interest software that advocates active and healthy public welfare life. Based on accurate geolocation, you can discover and find like-minded friends around you, view their profiles, updates and albums, make multi-dimensional matches based on your interests, and join different interest groups to interact with

everyone. You can also send messages, voice, photos and small videos to your interested friends at any time. In addition, there is a fresh and fun live streaming function, where you can follow your favorite anchors or apply to become an anchor yourself and share your real life through live video anytime, anywhere.

In addition to providing convenient and fast communication and social services for vertical people, Blued also actively promotes the use of mobile Internet and new social media to carry out AIDS prevention and propaganda and promote the development of social welfare. Through cooperation with governments at all levels, community organizations and international agencies, Blued is actively involved in HIV prevention and control, multicultural advocacy and anti-discrimination work among MSM. You can use Blued's "Test Appointment Function" to find the nearest public service testing site and make an appointment for safe, free public service testing and counseling, as well as browse and find rich, authoritative public health information at any time.

96.     Investors reading the English-language version of Blued and/or the English-language Offering Documents would not be aware of the contents of the Chinese version or the way in which the Chinese version has evolved in the face of the PRC Government crackdown on LGBTQ content online.

97.     Blued's prominent use of terms like "gay" and "LGBTQ" in its foreign-facing materials and English-language Prospectus, but careful decision to avoid such terms in its Chinese-language website, is a sign that the Offering Documents glossed over and concealed the serious headwinds to profitability faced by BlueCity.

**C.  The Shuttering of Zank Established the Rules of the Road Going Forward**

98.     No event has done more to establish the rules of the road – to set the boundaries under which Chinese gay dating apps like Blued would be permitted to operate – than the Government's decision to shut down Zank in 2017.

99.     While BlueCity did not mention the PRC Government's decision to close Zank, or any of the other gay dating apps in the Offering Documents, the PRC's decision to close Zank was critically important for the future business prospects of BlueCity.  This is because PRC censors

employ a strategy of deterrence, forcing some companies out of business to ensure compliance among others.

100.    With a user base of 20 million and having operated in China for about four years, Zank was considered a major competitor for Blued before being suddenly shut down by the PRC Government.

101.    Zank, another gay dating app, was founded by Ling Jueding in 2013, the year after the launch of Blued.  Much like Geng Le at Blued, Ling Jueding worked hard to ensure that the focus of Zank was not fleeting sexual encounters, but dating and community building.  In fact, Zank's official slogan was: "A person is not just a number such as age, height, or weight, but emotions and stories."  However, while Geng Le's strategy for developing Blued involved linking Blued to HIV/AIDS-prevention, Ling Jueding was willing to let Zank stand openly for gay identity politics.

102.    For example, in 2015, Ling Jueding wrote: "We feel a significant rise in the social acceptance of tongzhi over the past few years. I am honored to [be] able to join with many tongzhi in pushing forward progress in our time."  To satisfy these newly articulated tongzhi needs, Zank began to offer in-app products and services, including live streaming, an embedded online shop selling products from male skin care to menswear fashion, gay tourism packages, and an overseas surrogacy consultation.

103.    A researcher studying Chinese gay dating apps has chronicled the rise and fall of Zank:

> In January 2016 I met Ling Jueding in Beijing for the first time. . . .  In this meeting, Ling Jueding said that Blued's investment in HIV/AIDS prevention was PR puffery. He was confident that it was completely unnecessary for ZANK to participate in[] this government campaign because its economic activities were "legal" and posed no problem for the government. For Ling Jueding, HIV/AIDS

reminded people of the past, when homosexuality was categorized as a mental disorder.

104.    The researcher visited Zank's headquarters again the following year:

In February 2017, I paid ZANK [a] second visit. Its office had been relocated to an eight-floor building exclusively shared with a sub-district government office called Shuangjing. It is a rather unusual scene given the government's increasingly tight control on the on-screen representation of homosexuality since 2016. When I raised this question with Ling Jueding, he was as confident as in our first interview, saying that it was not a "problem" because ZANK was doing "legal" business.

105.    Less than two months after that visit, Zank was shut down by the PRC Government for its "illegal content."

106.    The fall of Zank sent shockwaves through China's LGBTQ community and reveals that, in the present political climate, there are limited prospects for "pink economy" companies doing business in China.

107.    Commentators struggling to make sense of how a company as established and popular as Zank could be shut down have focused on two major differences between Zank and Blued.  First, Zank strayed from the PRC-sanctioned gay health agenda.  Even though Zank did offer health products and services, Zank chose not to ally itself with the fight against HIV/AIDS, which the Government viewed as threatening to the status quo.

108.    After Zank was shut down, BlueCity (although already associated with the fight against HIV/AIDS due to its connection with Danlan) launched its *He Health* division, providing "access to a wide variety of HIV-related medication and consulting services, drugs and nutritional supplements related to men's health, in cooperation with our high-quality vendors and partner medical practitioners."

109.    Second, even though Zank prohibited pornography and obscenity, Zank did not take its censorship responsibilities seriously enough for the PRC Government's liking.  For

example, as of 2017, when Zank had 32 full-time employees, only one staff member was assigned to the censorship division, which relied on eleven part-time censors in an attempt to reduce personnel expenses.  This censorship effort was not commensurate with Zank's 20 million users, and Zank paid the price.

110.   By contrast, Blued invested enormously in censorship around this time.  In 2018, when Blued had about 200 employees, approximately 60 of them worked on the censorship team, approving any publicly visible photos and monitoring live streaming content 24 hours a day.

111.   Blued's censorship team has since grown dramatically.  As of December 31, 2020, when Blued had 755 full-time employees, Blued's censorship team had expanded to 197 full-time members.  The cost of such a censorship operation is enormous, but it is the price of staying in business.

112.   The shutdown of Zank forced Blued to greatly increase the type of content it censors, as well.  Post-Zank, Blued forbids live streamers from talking about their personal sex life, and broadcasting from bathrooms.  Blued has also adopted a new dress code and code of conduct for live streamers, which prohibits a wide range of clothing, including shorts above the knee.

113.   After Zank's closure, Ling Jueding appealed to the PRC Government to allow the app to come back online.  The PRC Government denied Jueding's appeals, however, and notified him that the closure was permanent.

114.   By the time the researcher paid a third visit to Ling Jueding in Beijing in April of 2018, all of Zank's staff had been dismissed, its offices vacated, and the optimism that Jueding had displayed in the prior two visits had disappeared.  Jueding told the researcher that he had been

wrong about gay businesses in China. Jueding said that he planned to abandon the "pink economy" and launch a "mainstream" e-commerce site instead.

**BlueCity's Materially False and Misleading Statements in its Offering Documents**

115.   The Offering Documents stated that:

"We generate revenue primarily through (i) live streaming services, (ii) membership services, (iii) advertising services, and (iv) others including family planning services and health-related services. . . .  Our revenues and results of operations depend on our ability to monetize our user base, to convert more users to paying users and to increase the spending of our paying users. . . . ***Currently, revenues generated from live streaming is the largest component of our revenues, and we expect revenues generated from our recently launched membership services will grow quickly***."

116.   At the time of the IPO, BlueCity relied on its live-streaming business for over 85% of its revenues, generating more than ten times as much revenue from live streaming as any other business segment.  However, live-streaming is a notoriously low-margin business.  Because of the limitations in the live-streaming business model – both the high cost of complying with PRC censors, as well as the thin margins left over after compensating streamers and their talent agents – the success of BlueCity's IPO depended on demonstrating to investors that BlueCity had another path to profitability, particularly given that the Company had not yet made a profit.

117.   Membership services, which include both subscription-based and pay-per-use services, entitle BlueCity users to "additional functionalities and privileges on [the] mobile app," as the Offering Documents explain.  These membership services stand at the heart of the dating function, as they focus on bringing more interest and ultimately, matches, to the user's profile.  For example, some of Blued's pay-per-use membership services include "Spotlight" (giving members more exposure to their profile for a certain period), "Boost" (being recommended to more users), and "Super Like" (the ability to send a special message to show strong interest in another user):

  

118.    It was misleading to suggest that BlueCity's path to profitability was its "recently launched membership services" for several reasons.  First, it suggested that BlueCity was just now pivoting from the notoriously low-margin live-streaming model to the potentially very lucrative business of selling membership services, which is how the hugely profitable dating apps with which American investors are familiar make their money.  However, the Blued app started as a dating app in 2012, and only introduced live streaming in 2016 as a means of diversifying its offerings.

119.    When investors read "membership services," they are instantly reminded of the extremely profitable dating apps like Tinder.  Analysts are, as well.  For instance, an Oppenheimer Equity Research report, initiating coverage shortly after BlueCity's Offering Documents touted the "recently launched membership services," wrote:

> Membership services have been proven to be an effective monetization model on dating platforms. For example, dating app Tinder also provides subscription + *à la carte* services (e.g., Tinder Gold and Super Likes). The model is very successful in terms of monetization, making it the highest-grossing app in the world in the 12 months ended September 2020 (excluding games), according to AppAnnie.

120.    But since Blued debuted its mobile app in 2012, nearly every major gay dating app in China except for Blued has been shut down by the PRC Government, which has led BlueCity to downplay its dating app component, the component housing these touted membership services.

26

121.    Viewed in context, then, it was misleading for the Offering Documents to suggest to investors that BlueCity would generate quickly-growing revenues from membership services. After years of minimizing its function as a gay dating app – in fact scrubbing the words "gay" and "dating" from its Chinese version – BlueCity was not going to change course now and make strides toward profitability by selling Tinder-style membership services, as it would likely be shut down if it tried.  BlueCity knew this, but investors did not.

122.    The Offering Documents also touted BlueCity's continued diversification of product and service offerings:

> Since our inception in 2011, we have strived to create a trusted community and deliver more diversified products and services to attract new users and keep our existing users engaged.
> . . .
> We will continue to diversify our product and service offerings and expand our monetization channels without compromising user experience.

123.    The Offering Documents' insistence that BlueCity is continuing to diversify its products and services in an effort to expand its monetization channels is misleading believe it fails to disclose the reality that BlueCity has managed to survive amid PRC Government censorship by linking itself with unprofitable and low margin health and health-related services.  In today's political climate, BlueCity is really only free to diversify its products and services in the healthcare space, which explains BlueCity's recent foray into online health consulting and pharmacy.  While there is nothing wrong with offering health-related services, it is misleading to claim to be striving to deliver more diversified products and services without disclosing this important limitation.

124.    To convince investors that BlueCity had a path to profitability other than live streaming, the Offering Documents told investors that: "***Following the success of our live***

*streaming services, we launched multiple new businesses, which have shown considerable early success with significant monetization upside*."

125.    Specifically, BlueCity touted its Bluedbaby platform, writing that the Company "offer[s] family planning services through our Bluedbaby platform", which was "launched [] in 2017 to provide users with personalized assisted reproduction consultation services, making the pursuit of parenthood a smoother journey for them", and "we are in the early stage of developing our health-related services and family planning services, currently [] accessible through the domestic version of Blued."  The Offering Documents further explained that: "We offer family planning services through our Bluedbaby platform to Chinese customers, hand-holding them throughout the journey in cooperation with our assisted reproductive technology, or ART, services partners outside of China."

126.    The Offering Documents addressed the monetization of the Bluedbaby platform, stating: "We generate revenues from family planning services by providing comprehensive consulting and administrative services to our customers such as ongoing facilitation of physical checks, remote conference with global experts, visa application support, and logistics arrangement for overseas trips", and, "[t]hrough Bluedbaby which we launched in July 2017, we collect consulting service fees from customers of our family planning service."

127.    It was misleading to present BlueCity's family planning business as being in an "early stage" or as "hav[ing] shown considerable early success with significant monetization upside."  As of March 31, 2020, *nearly three years after launching Bluedbaby*, the revenues generated from family planning services were languishing at less than 2% of the Company's revenues.  And as of March 2019, two years into Bluedbaby, even though Geng Le continued to tout the promising profit margins and bright future of Bluedbaby, the business had yet to produce

28

a single baby.  Contrary to the rosy picture suggested in the Prospectus, these services were neither "early stage" nor "successful."  Rather, the IPO appears to have been rushed to market in an attempt to cash out before it was too late.

128.    When BlueCity announced its fourth quarter earnings on March 23, 2021 – only eight months after the Offering Documents – BlueCity admitted that the BluedBaby platform would not be able to generate revenue as stated in the Offering Documents.  BlueCity announced that it was closing its family planning business, acknowledging that ***"[t]he family planning business never gained great traction[.]"***

129.    The proximity between BlueCity's Offering Documents and its decision to close the family planning business, as it "never gained great traction," suggests that BlueCity's statements touting the Bluedbaby platform in the Offering Documents were false when made.

130.    The Offering Documents state:

> Currently, our mobile app *Blued* is available in certain countries and regions with anti-LGBTQ public policies, negative cultural, social or religious sentiment toward the LGBTQ community, and where homosexuality is illegal. Legal consequences for same-sex activities and relationships in countries and regions where same-sex relationships are illegal vary depending on the local law, with the most severe being the death penalty. In countries and regions with anti-LGBTQ public policies or negative sentiment toward the LGBTQ community but same-sex relationships are not explicitly illegal, governmental authorities generally have discretion to block LGBTQ platforms on broad moral grounds. For example, in early 2018, dozens of apps for the LGBTQ community, including *Blued*, were blocked by the Google app store upon the request of the Indonesian government. Finally, while we do not expect that any government that permits us to carry on our business activities will reverse that policy, we cannot guarantee that we will continue to be able to provide our services in any jurisdiction where we currently have legal authority to do so.

131.    This is misleading.  By writing "***[i]n countries and regions** with anti-LGBTQ public policies or negative sentiment toward the LGBTQ community but same-sex relationships are not explicitly illegal, governmental authorities generally have discretion to block LGBTQ

platforms on broad moral grounds," and then immediately referring to an incident that occurred in Indonesia in 2018, the Offering Documents suggest that this disclosure is referring to peripheral nations and markets.  However, BlueCity's home market that contributes "substantially all" of its revenues is certainly a country were "same-sex relationships are not explicitly illegal" but has "negative sentiment toward the LGBTQ community" and where the Government has "discretion to block LGBTQ platforms on moral grounds."  After all, Zank's founder adamantly insisted that his business was legal, but was shut down anyway.  Obscuring the fact that this disclosure applies to China itself – and therefore failing to alert investors to the cautionary tale of Zank and the ripple effects that Zank's closure has on BlueCity's business to this day – is materially misleading to investors.

132.    In addition, it is misleading for the Offering Documents to state that "we do not expect that any government that permits us to carry on our business activities will reverse that policy," because this omits the fact that BlueCity has made fundamental changes to its business out of fear of Government shutdown and censor, and will continue to do so.

133.    Relatedly, the Offering Documents' disclosures about the PRC Government's control and censorship of LGBTQ content online are misleading:

> The PRC government and regulatory authorities have adopted regulations scrutinizing videos, audio and other content on the internet. ***Under these regulations, internet content providers are prohibited from posting or displaying internet content that, among other things, violates PRC laws and regulations, impairs the national dignity of China or the public interest, or is obscene, superstitious, fraudulent, violent or defamatory***.
> . . .
> In January 2019, CNSA issued the Censoring Criteria for Network Short Video Content, which set forth certain details of content prohibited to be broadcasted, such as violence, pornography, gambling, terrorism, and other illegal or immoral content. ***The enactment of these regulations may significantly increase our compliance costs in recruiting additional content reviewers and training them to identify content violations timely and accurately.***
> . . .

*Failure to identify and prevent illegal or inappropriate content from being uploaded on our platform may subject us to liability. To the extent that PRC regulatory authorities find any content on our platform objectionable, they may require us to limit or eliminate the dissemination of such content on our platform in the form of take-down orders, or cause our app to be removed from app stores.*

134.    This disclosure is misleading for several reasons.  First, stating that the PRC Government's regulations "*may* significantly increase our compliance costs in recruiting additional content reviewers and training them to identify content violations timely and accurately" omits the fact that the PRC's tightening censorship restrictions have been imposing ballooning compliance costs on BlueCity since BlueCity introduced its live streaming function in 2016. Government-imposed compliance costs connected to censorship is not a future risk, but a major reason why BlueCity is not, and has never been, profitable.

135.    Second, this disclosure is misleading because it severely understates the seriousness of the current political situation facing the LGBTQ community in China, particularly online.  The disclosure minimizes the real concern that the PRC Government will shut Blued down, and therefore conceals the effect this concern has on BlueCity's business and the fear it instills in its userbase today.

136.    Critically, while the disclosure acknowledges that internet content providers are prohibited from posting content that the PRC Government views as impairing the "national dignity of China" or that is "obscene," the disclosure omits the fact that the PRC Government has been cracking down on LGBTQ content for the past five years and has increasingly equated *homosexuality itself* with the "obscenity" that is worthy of being banned from the internet.  As outlined above, the retrenchment of PRC rules has forced Blued to scrub the word "gay" from its Chinese-language version and led to widespread fear of using the Blued app in China, hurting its

31

userbase and growth.  BlueCity had a legal obligation to disclose these facts, rather than to warn of a hypothetical future risk that had already come to pass.

137.    The Offering Documents also told investors not to rely on information that was different from what was presented in the Offering Documents:

> No dealer, salesperson or other person is authorized to give any information or to represent anything not contained in this prospectus or in any free writing prospectus we may authorize to be delivered or made available to you. ***You must not rely on any unauthorized information or representations.***

**Statutory Framework Applicable to the Registration Statement: Item 303 and Item 105**

138.    Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303, requires disclosure of any known events, uncertainties or trends that caused, or were reasonably likely to cause, BlueCity's disclosed financial condition not to be indicative of future results.

139.    Issuers must disclose both (a) known trends and uncertainties and (b) any potential material impact of known trends and uncertainties on their own operations even if the trends are a matter of public knowledge.  *Management's Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv. Co. Disclosures*, Release No. 6835 (May 18, 1989) (the "1989 Interpretive Release") available at 1989 WL 1092885; *see also Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 721 (2d Cir. 2011).

140.    Indeed, as a foreign issuer, BlueCity faces heightened obligations to disclose government or political actions.  Item 303 specifically instructs foreign private registrants like BlueCity to "discuss briefly any pertinent governmental economic, fiscal, monetary, or political policies or factors that have materially affected or could materially affect, directly or indirectly, their operations or investments by United States nationals." 17 C.F.R. § 229.303, ¶9.  There is no corresponding requirement for domestic companies.

141.    At the time of the IPO, the PRC Government's tightening censorship of LGBTQ content online and in the media was already having a material adverse effect on BlueCity, forcing it to downplay its core function as a dating app, assume ballooning compliance costs and lose users and potential users who increasingly fear using BlueCity's products.  This was a trend that needed to be disclosed under Item 303.

142.    In addition, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105, requires, in the "Risk Factors" section of the Registration Statement, a discussion of the material factors that made the offering risky or speculative and that each risk factor adequately describe the risk.

143.    The Offering Documents failed to warn investors of the PRC Government's tightening censorship of LGBTQ content online and in the media, which has resulted in increasing restrictions, compliance costs, and the shutdown of nearly every other major gay dating app in China.  At the time of the IPO, this retrenchment was already happening and already causing users and potential users to refrain from BlueCity's products.

**Post-IPO Developments**

144.    The PRC Government has continued to tighten its grip on LGBTQ content online and in the media after the IPO.  BlueCity's costs have skyrocketed, far outpacing its revenues, and traffic has taken a hit as well.

145.    On March 23, 2021, the Company announced the closure of the Bluedbaby platform, disclosing that "we are pivoting our services strategy from family planning to strictly health-related products and services. The family planning business never gained great traction, while health-related services centered on HIV prevention and treatment have huge potential. We believe He Health, our [] health-related service can be the engine for our next phase of growth."

146.    On this news, BlueCity's ADS price fell $3.25 per ADS, or 26.71%, over the following two trading sessions, to close at $8.92 per ADS on March 24, 2021.

147.    In fact, BlueCity's decision to close down Bluedbaby appears to have been made even closer in time to the IPO, and as a reaction to the PRC Government's anti-LGBTQ animus that BlueCity failed to sufficiently disclose in the Offering Documents.

148.    While BlueCity announced the closure of Bluedbaby on March 23, 2021, the Bluedbaby section of the BlueCity website actually disappeared in January, just days after a public scandal broke out in China relating to a Chinese movie star's use of a surrogate in the United States.

149.    Immediately after the movie star's use of a surrogate was publicized, the movie star was censured by state media and condemned by China's ruling Communist Party (CCP) agencies. "Surrogacy is clearly banned in our country, and its disregard of life makes one bristle with anger," state broadcaster CCTV said in a commentary.

150.    "Surrogacy has become so sensitive in the past two years.  Because of its risky status as an LGBTQ company, I think they abandoned that project," one researcher of Chinese politics explained.

151.    The closure of Bluedbaby and the retreat to its unprofitable "strictly health-related products and services . . . centered on HIV prevention and treatment" is another example of the trend that needed to be, but was not, disclosed: that, increasingly, it is the PRC Government's crackdown on LGBTQ content and the chilling effect this crackdown has on BlueCity's userbase that drives BlueCity's business decisions.  BlueCity is not chasing profits, but walking on eggshells.

152.    In December 2021, an article appeared in the Chinese press reporting that, as long as live streaming remains BlueCity's top contributor of revenue, the Company's chances of turning losses into profit are low, due to the low-margin nature of live streaming.  The article reported that the BlueCity understands this, and speculated that the Company might be running out of time if it is ever going to find a profitable business model.

153.    As a result of Defendants' wrongful acts and omissions, and the steep decline in the price of BlueCity's ADSs, which fell from an initial price of $16.00 to a closing price of $7.04 on July 19, 2021, when this lawsuit was filed, Plaintiffs and other Class members have suffered significant losses and damages.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

154.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired BlueCity ADSs in its IPO or purchased ADSs thereafter in the stock market pursuant and/or traceable to the Company's Offering Documents issued in connection with the IPO and were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families, legal representatives, heirs, successors or assigns and any entity in which the officers and directors of the Company have or had a controlling interest.

155.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by BlueCity or its transfer agent and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

156.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

157.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

158.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

159.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

      a.   Whether the Securities Act was violated by Defendants as alleged herein;

      b.   Whether statements made by Defendants to the investing public in the Offering Documents misrepresented material facts about the business and operations of BlueCity; and

      c.   The extent to which members of the Class have sustained damages and the proper measure of damages.

160.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**COUNT I**
**Violation of Section 11 of The Securities Act**
**Against All Defendants**

161.    Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

162.    This Cause of Action is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

163.    This Cause of Action does not sound in fraud.  Plaintiffs do not allege that Defendants had scienter or fraudulent intent, which are not elements of a Section 11 claim.

164.    The Offering Documents for the IPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

165.    The Defendants named in this Cause of Action are strictly liable to Plaintiffs and the Class for the misstatements and omissions.

166.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

167.    By reason of the conduct herein alleged, each Defendant named herein violated, and/or controlled a person who violated, Section 11 of the Securities Act.

168.    Plaintiffs acquired BlueCity ADSs pursuant and/or traceable to the Offering Documents for the Company's IPO.

169.    Plaintiffs and the Class have sustained damages.  The value of BlueCity ADSs has declined substantially subsequent to and because of Defendants' violations.

170.    At the time of their purchases of BlueCity ADSs, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts.  Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiffs commenced this action.  Less than three years elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiffs commenced this action.

### COUNT II
**Violation of Section 12(a)(2) of the Securities Act
Against All Defendants**

171.    Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

172.    This Cause of Action does not sound in fraud.  Any preceding allegations of fraud, fraudulent conduct, or improper motive are specifically excluded from this Cause of Action.  Plaintiffs do not allege that Defendants had scienter or fraudulent intent, which are not elements of this claim.

173.    Defendants offered, sold and/or solicited a security, namely BlueCity ADSs, by means of the IPO identified above, or were-controlling persons of BlueCity or of those who offered and sold BlueCity ADSs.  The Offering Documents contained untrue and/or misleading statements of material fact that the Defendants in the exercise of reasonable care should have known were false.

174.    Defendants actively solicited the sale of BlueCity ADSs to serve their own financial interests.

175.    At the time of purchase of BlueCity ADSs, Plaintiffs and other members of the Class did not know that the representations made to them by the Defendants in connection with the distribution of ADSs and the matters described above were untrue, and did not know that the above described omitted material facts were not disclosed.  Indeed, the Offering Documents told investors not to rely on information different from what was presented in the Offering Documents.

176.    As a result, Plaintiffs and Class members are entitled to tender BlueCity the ADSs purchased and receive from Defendants the consideration paid for those ADSs with interest thereon, less the amount of any income received thereon, or damages resulting from Defendants' conduct.

177.    Defendants are liable to Plaintiffs and Class members pursuant to Section 12(a)(2) of the Securities Act, as seller of the securities in connection with the IPO.

178.    This Action is brought within three years from the time that the ADSs upon this Cause of Action is brought were sold to the public, and within one year from the time when Plaintiffs discovered or reasonably could have discovered the facts upon which this Cause of Action is based.

**<u>COUNT III</u>**
**Violation of Section 15 of the Securities Act**
**Against The Individual Defendants**

179.    Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

180.    This Cause of Action is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Class, against the Individual Defendants.

181.    The Individual Defendants each were control persons of BlueCity by virtue of their positions as directors and/or senior officers of BlueCity's predecessor entities immediately prior to the IPO.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of BlueCity.

182.    The Individual Defendants were culpable participants in the violation of §11 of the Securities Act as alleged above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

183.    This claim is brought within one year after discovery of the untrue statements or omissions in the Offering that should have been made or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering.  It is therefore timely.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding rescission or a rescissory measure of damages; and

E.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.


Dated: April 15, 2022

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: */s/ Phillip Kim*

Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
Michael Cohen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com
        mcohen@rosenlegal.com


**LEVI & KORSINSKY, LLP**

By: */s/ Shannon L. Hopkins*
Shannon L. Hopkins (SH-1887)
Nicholas I. Porritt (NP- 8460)
Adam M. Apton (AA - 9841 )
Max E. Weiss (MW-6697)
55 Broadway, 10th Floor
New York, NY 10006
Tel: (212) 363-7500
Fax: (212) 363-7171
Email: shopkins@zlk.com
        mweiss@zlk.com

*Co-Counsel for Lead Plaintiffs and the Class*


cc:     All counsel of record by ECF