**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JUNHUI JIANG, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:21-cv-04044-FB-CLP |
| Plaintiff, | **ORAL ARGUMENT REQUESTED** |
| v. | |
| BLUECITY HOLDINGS LIMITED, BAOLI MA, ZHIYONG (BEN) LI, ZHE WEI, WEI YING, COLLEEN A. DE VRIES, AMTD GLOBAL MARKETS LIMITED, LOOP CAPITAL MARKETS LLC, TIGER BROKERS (NZ) LIMITED, PRIME NUMBER CAPITAL LLC, R. F. LAFFERTY & CO., INC., and COGENCY GLOBAL INC., | |
| Defendants. | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT BLUECITY HOLDINGS LIMITED'S MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

COUNTERSTATEMENT OF FACTS .................................................................................... 3

    A.    BlueCity's IPO ............................................................................................... 3

    B.    The PRC Government's Censorship ............................................................... 4

    C.    BlueCity's Products and Services .................................................................. 7

    D.    The Truth Begins to Emerge .......................................................................... 8

ARGUMENT ......................................................................................................................... 8

    A.    Plaintiffs Have Met their Pleading Burden Under the Securities Act ........................... 8

    B.    The Complaint Adequately Alleges Actionable Misrepresentations and Omissions ...... 9

        1.    Statements Concerning PRC Government Censorship (AC ¶¶130-137)........................ 10

        2.    Statements Concerning BlueCity's Products and Services (AC ¶¶115-129).................. 14

        3.    Defendant Violated Its Duty to Disclose Uncertainties and Risks in Violation of Item 105 and 303 of Regulation S-K ................................................................................ 16

    C.    Defendants Did Not Disclose, and Plaintiffs Did Not Know About, the PRC's Tightening Restrictions on LGBTQ Content in China and Their Effect on BlueCity's Business.............. 20

    D.    The "Bespeaks Caution Doctrine" Does Not Apply Here. ........................................... 21

    E.    The Statements Identified by Plaintiffs are Not Nonactionable Puffery........................ 23

    F.    Plaintiffs Adequately Allege A Section 15 Claim. ..................................................... 23

    G.    Plaintiffs Have Not Waived Their Right to a Jury Trial. ............................................. 23

CONCLUSION...................................................................................................................... 24

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009).............................................................................................. 8

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.,*
    957 F. Supp. 2d 277 (S.D.N.Y. 2013) ................................................................. 7

*Feit v. Leasco Data Processing Equip. Corp.,*
    332 F. Supp. 544 (E.D.N.Y. 1971) .................................................................... 20

*Gross v. GFI Grp., Inc.,*
    162 F. Supp. 3d 263 (S.D.N.Y. 2016) ............................................................... 23

*Herman & Maclean v. Huddleston,*
    459 U.S. 375 (1983).............................................................................................. 2

*Horowitz v. Sunlands,*
    2021 WL 1224517 (E.D.N.Y. Mar. 31, 2022)............................................... 9, 20

*In re Am. Int'l Grp. Inc., 2008 Secs. Litig.,*
    741 F. Supp. 2d 511 (S.D.N.Y. 2010) ............................................................... 13

*In re Bank of Am AIG Disclosure Sec. Litig.,*
    980 F. Supp 2d 564 (S.D.N.Y. 2013) ................................................................ 18

*In re Barclays Bank PLC Sec. Litig.,*
    2017 WL 4082305 (S.D.N.Y. Sep. 13, 2017)................................................... 16

*In re Bear Stearns ERISA Litig.,*
    763 F. Supp. 2d 423 (S.D.N.Y. 2011) ............................................................... 13

*In re Blue Apron Holdings, Inc. Sec. Litig.,*
    2020 WL 1950783 (E.D.N.Y. Apr. 22, 2020) ..................................................... 9

*In re China Mobile Games & Entm't Grp., Ltd Sec. Litig.,*
    No. 14-CV-4471 (KMW), 2016 WL 922711 (S.D.N.Y. Mar. 7, 2016) ............... 21

*In re Enzymotec,*
    2015 WL 8784065 (D.N.J. Dec. 14, 2015)............................................. 18, 22, 23

*In re Facebook, Inc., IPO Secs. & Deriv. Litig.,*
    986 F. Supp. 2d 487 (S.D.N.Y. 2013) ............................................................ 7, 13

*In re Fuwei Films Sec. Litig.*,
634 F. Supp. 2d 419 (S.D.N.Y. 2009) ........................................... 21

*In re iDreamSky Tech. Ltd. Sec. Litig.*,
236 F. Supp. 3d 830 (S.D.N.Y. 2017) ........................................ 14, 17

*In re Keyspan Corp. Sec. Litig.*,
383 F. Supp. 2d 358 (E.D.N.Y. 2003) ......................................... 18

*In re Prudential Sec. Inc. Ltd. Partnerships Litig.*,
930 F. Supp. 68 (S.D.N.Y. 1996) .............................................. 19

*In re Tuckcell Iletism Hizmetler A.S. Sec. Litig.*,
202 F. Supp. 2d 8 (S.D.N.Y. 2001) ............................................ 13

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
818 F.3d 85 (2d Cir. 2016) ................................................. 18, 19

*Lehman Bros. Holdings v. Bethany Holdings Grp.*,
801 F. Supp. 2d 224 (S.D.N.Y. 2011) ......................................... 24

*Lin v. Interactive Brokers Grp., Inc.*,
574 F. Supp. 2d 408 (S.D.N.Y. 2008) ......................................... 13

*Lindsay v. Morgan Stanley*,
592 F.3d 347 (2d. Cir. 2010) ................................................. 12

*Litwin v. Blackstone Grp., L.P.*,
634 F.3d 706 (2d Cir. 2011) .............................................. passim

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
900 F.2d 576 (2d Cir. 1990) ................................................. 10

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
500 F.3d 171 (2d Cir. 2007) ................................................. 23

*Meyer v. JinkoSolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014) ............................................. passim

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
709 F.3d 109 (2d Cir. 2013) ............................................. 8, 9, 17

*Nat'l Credit Union Admin. Bd. v. Wachovia Cap. Mkts., LLC*,
2014 WL 1795294 (S.D.N.Y. 2014) ............................................. 9

*Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,
595 F.3d 86 (2d Cir. 2010) .................................................. 12

*P. Stolz Family P'ship L.P. v. Daum*,
   355 F.3d 92 (2d Cir. 2004) ........................................................................... 22

*Panther v. Jianpu Tech*., Inc,
   2020 WL 5757628 (S.D.N.Y. Sep. 27, 2020) ................................................ passim

*Singh v. Schikan*,
   106 F. Supp 3d 439 (S.D.N.Y. 2015) ............................................................ 14

*Willard v. Up Fintech Hldgs. Ltd.*,
   527 F. Supp 3d 609 (S.D.N.Y. 2021) ............................................................ 17

*Y-Gar Cap. LLC v. Credit Suisse Grp. AG*,
   2020 WL 71163 (S.D.N.Y. Jan. 2, 2020) ...................................................... 16

*Yi Xiang v. Inovalon Holdings*,
   254 F. Supp. 3d 635 (S.D.N.Y. 2017) ........................................................... 19

**Statutes**

15 U.S.C. § 15 ...................................................................................................... 23

15 U.S.C. § 77k ............................................................................................... passim

17 C.F.R. § 229.105 ............................................................................................. 16

17 C.F.R. § 229.303 .............................................................................. 16, 18, 20, 21

**Rules**

F.R.C.P.  9(b) ....................................................................................................... 9

F.R.C.P. 12(b)(6) ................................................................................................. 8

F.R.C.P. 8(a) ........................................................................................................ 9

## PRELIMINARY STATEMENT

BlueCity billed itself as China's first online platform for the LGBTQ community.  In its Prospectus and Registration Statement for its IPO, BlueCity told the inspiring story of its founder, Defendant Baoli Ma, who grew BlueCity from an anonymous online forum into "a global gateway for the 'coming out journey' of the LGBTQ population, encouraging them to be themselves, feel good about themselves, and embrace the community." At the time of the IPO, BlueCity proclaimed that it was the "Largest Online LGBTQ Community In China" with over 49 million registered users, including 6 million monthly active users who spent on average over 60 minutes a day on the platform across more than 16 daily sessions. After noting that "[h]omosexuality was removed from an official list of mental illness in China [in 2001]," BlueCity highlighted the size of the LGBTQ population (estimated to grow to 591 million by 2023) and its implications for growth. BlueCity successfully raised $78.9 million in its IPO from the sale of 5.3 million of its America Depository Shares ("ADS") at $16.00 per ADS.

Notwithstanding and to the contrary, BlueCity did not tell investors that its LGBTQ dating service was effectively prohibited in the People's Republic of China ("PRC"). BlueCity also failed to disclose the PRC's tightening censorship of LGBTQ content online and how these tightening restrictions would impact the company's revenue, earnings, and overall operations (*e.g.*, increased compliance costs, risk of shutdown). Unbeknownst to investors, BlueCity had adopted measures to combat these acute risks, such as removing the phrases "Gay" and "LGBTQ" from their flagship app, *Blued*, and replaced them with terms like "friends with shared interests" and "vertical groups"—showing just how significant and material these risks truly were.

Plaintiffs seek to hold Defendants liable for failing to disclose these risks under Section 11 of the Securities Act of 1933. Congress designed the Securities Act as a form of consumer

1

protection "to assure compliance with the disclosure provisions . . . by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & Maclean v. Huddleston*, 459 U.S. 375, 381-82 (1983). The Securities Act purposefully replaces the rule of *caveat emptor* with a strict duty on the part of the issuer, its board of directors, and its advisors to accurately disclose relevant financial and operational information as required under applicable U.S. Securities and Exchange Commission regulations. Importantly, there is no requirement for a plaintiff to either allege or prove at trial that any defendant acted with a particular state of mind. Where a registration statement contains a misrepresentation or omits required information, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements." *Id*. Accordingly, claims under the Securities Act are very different from fraud claims made pursuant to the Exchange Act and, as the Supreme Court has observed, pleading Securities Act claims "places a relatively minimal burden on a plaintiff." *Id*. Plaintiffs have satisfied this minimal burden.

Defendants sidestep this aspect of the law in their motion to dismiss, claiming instead that the regulatory risks associated with the PRC's restrictions on LGBTQ content were publicly known (and, therefore, they should not be held responsible for failing to disclose them or describe how they impacted BlueCity's business). Even if the Court were inclined to credit this argument at the pleading stage (which it should not), BlueCity described itself only generally as a growing company that *may* be impacted by government regulations and did not identify or disclose its business practices as being in violation of PRC regulations. Pursuant to the Second Circuit's decision in *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245 (2d Cir. 2014), these disclosures were inadequate because they merely warned of *potential* future risks and not those that had already materialized.

Investors paid a steep price for Defendants' misstatements and omissions. From the time of the IPO to the commencement of this action, BlueCity's ADSs have plummeted from $16.00 to less than $1.50 per ADS only to be taken private within just two years of being offered, leaving investors with a tenth of the IPO price they initially paid. Contrary to Defendants' rosy description of BlueCity's ability to function as a gateway for the "coming out journey" of China's burgeoning LGBTQ population, the PRC's crackdown was underway and the tightening restrictions were already hampering the BlueCity's business prospects and threatening its very existence as a gay dating app based in China. Investors in BlueCity's ADS were entitled to know this and should be allowed to recover the damages they sustained as a result. Defendants' motions to dismiss should be denied.

## COUNTERSTATEMENT OF FACTS

**A.    BlueCity's IPO**

BlueCity went public on July 8, 2020. At the time of the IPO, BlueCity provided an online platform for the LGBTQ community for social networking, live streaming, healthcare, public-health education, and reproductive consultation services. ¶3.[1] BlueCity's ADS's were traded on the NASDAQ under the ticker symbol "BLCT." Proceeds from the IPO were to be used for market expansion to gain more users for the company's *Blued* dating app. Prospectus ("Pr.") at 75.

At the time of the IPO, BlueCity relied on its live-streaming business for over 85% of its revenues, generating more than ten times as much revenue from live streaming as any other business segment. ¶116. The Prospectus also highlighted BlueCity's diversification of its product

---

[1] "¶__" refer to paragraphs in the Amended Complaint for Violations of the Securities Act of 1933 (Dkt. No. 22).

and service offerings. ¶124. Specifically, BlueCity highlighted its *Bluedbaby* platform, writing that the company "offer[s] family planning services through our *Bluedbaby* platform." ¶¶125-26.

BlueCity also generally included various regulatory risks it faced, advising simply that the PRC has adopted regulations scrutinizing content on the internet. Defendants generally warned investors that they were prohibited from posting content that "violates PRC laws and regulations, impairs the national dignity of China or the public interest, or is obscene, superstitious, fraudulent, violent or defamatory." ¶133. Defendants also warned that the enactment of 2019 regulations *may* significantly increase their compliance costs in recruiting additional content reviewers and training them to identify content violations. *Id.* (emphasis added).

Without specifically mentioning China, BlueCity also stated that its products are available in "certain countries and regions with anti-LGBTQ public policies, negative cultural, social or religious sentiment towards the LGBTQ community, and where homosexuality is illegal." ¶130. In fact, without any reference to China, BlueCity advised investors that in 2018 the Indonesian government requested that the Google app store block LGBTQ apps, including *Blued*. *Id.* BlueCity stated further that "while we do not expect that any government that permits us to carry on our business activities will reverse that policy, we cannot guarantee that we will continue to provide our services in any jurisdiction where we currently have legal authority to do so." *Id.*

**B.    The PRC Government's Censorship**

In 2016, the PRC began regulating LGBTQ content online and in the media as "vulgar, immoral and unhealthy content." ¶66. In March 2016, the PRC said that LGBTQ content "exaggerate[d] the dark side of society" and deemed homosexuality, extramarital affairs, one-night stands and underage relationships as illegal on-screen. Shows that included homosexuality were considered to portray "abnormal sexual relations" and regulators scrubbed all depictions of gay

4

people from TV. ¶67. The crackdown continued in November and December 2016, when the Cyberspace Administration (CAC) released new Live Streaming Service Management Rules and the Ministry of Culture issued further regulations on cyber performances, known as the Online Performance Business Operation Management Rules. ¶68. Together, the new regulations added to the list of prohibited content, strengthened the censorship responsibilities of live streaming platforms, and required live streaming service providers to verify the real identity of all performers. *Id*.

The PRC proceeded to ban several gay-focused apps. In April 2017, the Government shut down the popular gay dating app, *Zank*, which had operated for four years, accusing it of hosting pornographic and obscene content. ¶69. *Zank* was the most well-known of a group of 18 apps (including another gay-focused app called *BlueSky*) that the Government removed in a coordinated purge. ¶70. A lesbian-dating app, *Rela*, disappeared shortly after. ¶71.

In June of 2017, the China Netcasting Services Association (CNSA) released a new regulation categorizing homosexual content alongside incest, sexual deviancy, sexual assault, sexual abuse, and sexual violence as "vulgar," "obscene," and "pornographic." ¶72. On November 9, 2017, the popular livestreaming app *Peepla*, known for its same-sex content, was shut down by the National Work Group for Combating Pornography and Illegal Publications (NWGCPIP), a member department of the CAC. ¶73. The crackdown against *Peepla* led to criminal charges and the arrests of several male streamers for lewd behavior. *Id.* The censorship has continued to intensify, with thousands of websites, blogs and individual accounts being shut down, and internet platforms forced to hire legions of censors to do the Government's bidding. ¶74.

Unbeknownst to U.S.-based investors, BlueCity employed various measures and tactics to evade regulators. For example, *Blued* added a lengthy description to its Chinese version which downplayed the app's connection to gay culture and replaced it with a commitment to gay health:

> Blued is a social interest software that advocates active and healthy public welfare life. Based on accurate geolocation, you can discover and find like-minded friends around you, view their profiles, updates and albums, make multi-dimensional matches based on your interests, and join different interest groups to interact with everyone. You can also send messages, voice, photos and small videos to your interested friends at any time. In addition, there is a fresh and fun live streaming function, where you can follow your favorite anchors or apply to become an anchor yourself and share your real life through live video anytime, anywhere.

> In addition to providing convenient and fast communication and social services for vertical people, Blued also actively promotes the use of mobile Internet and new social media to carry out AIDS prevention and propaganda and promote the development of social welfare. Through cooperation with governments at all levels, community organizations and international agencies, Blued is actively involved in HIV prevention and control, multicultural advocacy and anti-discrimination work among MSM. You can use Blued's "Test Appointment Function" to find the nearest public service testing site and make an appointment for safe, free public service testing and counseling, as well as browse and find rich, authoritative public health information at any time.

¶95.

Investors reading the English-language version of *Blued* and/or BlueCity's Prospectus were unaware of the contents of the Chinese version or the way in which the Chinese version evolved in the face of the PRC's domestic regulatory policies against LGBTQ content. ¶96.[2] Thus, BlueCity omitted this information and, in turn, the regulatory risks it faced from the PRC.

---

[2] BlueCity does not dispute this. Instead, it highlights various Chinese press releases—whose translations are unauthenticated— that include the words "gay" and "LGBTQ" to deflect liability. *see* Liu Decl., Exs. F-Q, W. This is a classic red herring. They use these extraneous materials to create an alternative narrative to direct the Court away from Plaintiffs' well-pled allegations. These press releases have nothing to with the allegations that the company failed to disclose to investors

### C.     BlueCity's Products and Services

BlueCity launched its mobile dating app *Blued* in November 2012. ¶52.  Originally, it was a copy of its popular Western counterparts such as *Grindr* and *Jack'd*. ¶53. Unbeknownst to investors, however, *Blued* diversified its product offerings substantially, positioning itself less as a dating app and more as a hub for LGBTQ entertainment and health. ¶54. BlueCity worked to curate an image as a health education platform, particularly around HIV, to assuage concerns of its regulators. ¶¶55, 58. To further mitigate its exposure to the PRC's anti-LGBTQ regulations, BlueCity made efforts at international expansion. ¶59. However, at the time of BlueCity's IPO, over 90% of its total revenues still came from within China. *Id.*  While Defendants painted a rosy picture of the founder's one-person operation maturing into a "full suite of services empowering LGBTQ persons in all aspects of their daily lives," the PRC's continuing efforts to censor the LGBTQ Community frustrated BlueCity's ability to operate a successful business, by imposing runaway compliance costs, requiring self-censorship, foreclosing profitable services, and deterring would-be users, none of which was disclosed in the Registration Statement and/or Prospectus. ¶60.

---

that it could not use these terms on its app or conspicuously display LGBTQ content. Furthermore, because those sources were not incorporated into the Amended Complaint ("AC") or relied on in drafting it, they cannot be considered now. *See City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277 (S.D.N.Y. 2013) (refusing to consider disputed exhibits that were not "integral to, relied upon, attached to, or referenced in the [c]omplaint"). Defendant's reliance on these articles is misguided and does not absolve them from liability for framing risks from the PRC Governments' regulations as theoretical when they had already materialized. *See, e.g.*, *In re Facebook, Inc., IPO Secs. & Deriv. Litig.*, 986 F. Supp. 2d 487, 515 (S.D.N.Y. 2013); *see also Panther v. Jianpu Tech.*, Inc, 2020 WL 5757628, at *12 (S.D.N.Y. Sep. 27, 2020) (warnings are insufficient if "framed as mere hypotheticals" which "imply that the risk" is "theoretical," when it "has already materialized").  For these reasons all the materials annexed to the Liu Declaration that were not referenced in the AC should be disregarded. Defendant has not requested that the Court take judicial notice of these extraneous documents and they should not be permitted to do so in their reply.

**D.** **The Truth Begins to Emerge**

On March 23, 2021, BlueCity reported disappointing earnings for the fourth quarter of 2020 that missed consensus estimates by nearly $4 million amid continuing ballooning costs, including a 29% increase in cost of revenues year-over-year primarily due to the growth of live streaming services. General and administrative expenses also increased 345.5% year-over-year due to increased professional fees and staff cost.

On the earnings call that same day, CEO Baoli Ma revealed for the first time that BlueCity had shut down its *BluedBaby* business, even though it had highlighted family planning services as a significant market opportunity for BlueCity in its bid to attract IPO investors. Significantly, BlueCity admitted that the *BluedBaby* "family planning business never gained great traction," and that the company would instead concentrate on HIV prevention and treatment, a focus of BlueCity that predated the launch of *Blued*. In response to these surprising revelations, BlueCity's ADS price fell $3.25 per ADS, or 26.71%, over the following two trading sessions, to close at $8.92 per ADS on March 24, 2021.

<u>**ARGUMENT**</u>

**A.** **Plaintiffs Have Met their Pleading Burden Under the Securities Act**

On a Rule 12(b)(6) motion, the court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 119 (2d Cir. 2013). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "The plausibility standard is not akin to a 'probability requirement.'" *Id*. A complaint's allegations must be examined in their totality. *See Nat'l Credit Union Admin. Bd. v. Wachovia Cap. Mkts.,*

8

*LLC*, 2014 WL 1795294, at *2 (S.D.N.Y. 2014) (citing *Royal Bank of Scotland*, 709 F.3d at 123 n.7 ("We do not attempt to identify any "minimum" that a plaintiff must plead in order to state a claim under §§ 11 & 12(a)(2) of the '33 Act")). If a plaintiff sufficiently alleges "'any part of the registration statement … contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements not misleading[,]' [plaintiff has] stated a claim for liability under Section 11." *In re Blue Apron Holdings, Inc. Sec. Litig.*, 2020 WL 1950783 at * 9 (E.D.N.Y. Apr. 22, 2020) (quoting 15 U.S.C. §77k(a)). "[Plaintiff] must eventually provide those allegations, of course, but that is not his burden on a motion to dismiss." *Horowitz v. Sunlands*, 2021 WL 1224517 at *3 (E.D.N.Y. Mar. 31, 2022) (Block, J.).

The Amended Complaint does not allege fraud. It does not need to. It alleges only that BlueCity is strictly liable for Defendants' false and misleading statements. *Litwin v. Blackstone Grp., L.P.,* 634 F.3d 706, 715 (2d Cir. 2011) ("Fraud is not an element or a requisite to a claim under Section 11 or Section 12(a)(2) .... [A] plaintiff need allege no more than negligence to proceed under Section 11 and Section 12(a)(2) ....")). As pleaded, Plaintiffs' claims are not subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *See id*. In other words, this is a notice pleading case, subject only to the "short and plain statement" requirements of Federal Rule of Civil Procedure 8(a). *See id.*

**B.    The Complaint Adequately Alleges Actionable Misrepresentations and Omissions**

Defendant generally argues that BlueCity did not make any material misrepresentations or omissions and did not "mislead anyone about anything" in its Registration Statement and/or Prospectus. BlueCity Mot. at 1-2. The Amended Complaint, however, pleads two categories of false and misleading statements: (1) statements concerning the PRC's regulations on LGBTQ

9

content and their effect on BlueCity's business; and (2) statements concerning BlueCity's business prospects under the PRC's regulatory regime.

Even if a statement is literally true, it is actionable if it is misleading in context. *See Meyer*, 761 F.3d at 250-51 ("[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth… The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context. Thus, when an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate." (internal citations and quotation marks omitted)); *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) (disclosures are "measured not by literal truth," but on "whether defendants' representations, taken together and in context, would have mislead a reasonable investor").

## 1.    Statements Concerning PRC Government Censorship (AC ¶¶130-137)

BlueCity failed to provide more than generic statements about the regulatory landscape in China and downplayed the existential threat that it faced from these regulations. The company chose to disclose 2019 regulations requiring it to monitor "objectionable" content or face sanctions but omitted that LBGTQ content was *per se* "objectionable."  They also chose to spotlight the Indonesian government's actions, which led to the removal of *Blued* and its competitors from the Google app store in that country, while entirely omitting the PRC's actions that led to the removal of 18 of BlueCity's competitors from the Chinese marketplace, where BlueCity made substantially all of its money. Thus, the regulatory environment was materially different—and much worse—than represented.

These allegations state a claim under Section 11. The Second Circuit's decision in *Meyer v. JinkoSolar Holdings Co.*, *supra*, directly illustrates Plaintiffs' point on this issue. In that case,

the Second Circuit held that: "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." 761 F.3d at 250-51. In *Meyer,* the prospectus discussed monitoring teams for pollution abatement, that the company was subject to Chinese environmental regulations, and that non-compliance could lead to bad publicity and even the suspension of the company's business. 761 F.3d at 251. The Second Circuit held that, taken together, these statements were misleading since the defendants did not disclose that it was failing to prevent substantial violations of regulations. *Id.* Like in *Meyer*, BlueCity's Prospectus warned that it was subject to regulations surrounding objectionable content and failure to limit or eliminate such content could lead to take-down orders or cause *Blued* to be removed from app stores. These warnings gave investors a misleading picture of BlueCity's operations because they failed to disclose that LGBTQ content was *per se* objectionable to the PRC.

Similarly, in *Panther v. Jianpu Tech., Inc*, for example, a holding company for a financial online platform and advisory business had framed all "risks from regulation … as hypotheticals" even though the "risk … already materialized." 2020 WL 5757628, at *12 (S.D.N.Y. Sep. 27, 2020). In *Panther*, the Court found that disclosures of "the risk that Chinese authorities might enhance regulation and enforcement" were insufficient even though no regulatory enforcement occurred pre-IPO. *Id.* "A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability. *Id*. at 13. Here, BlueCity's disclosures are similarly inadequate because they vaguely warn "[t]o the extent that PRC regulatory authorities find any content on our platform objectionable, they **may** require us to limit or eliminate the dissemination of such content on our platform in the form of take-down orders or cause our app to be removed from app stores." Pr. at 32 (emphasis supplied). Given that

11

LGBTQ content in China was *per se* "objectionable" and that 18 of their competitors were banned for violating these regulations at the time of the IPO, this disclosure was woefully insufficient. Regulatory action need not have occurred and instead, can be "reasonably likely" to have an adverse impact on the company's results and operations to require disclosure under the federal securities laws. *Id*. at *18.

Furthermore, as in *Panther*, Defendant's statements in the Prospectus that "we do not expect that any government that permits us to carry on our business activities will reverse that policy" and that "regulations may significantly increase our compliance costs" required clarification that other apps were shut down because of their focus on the LGBTQ community, and that their compliance costs had increased and would continue to increase in order for BlueCity to continue to operate. This is because "the literal truth of an isolated statement is insufficient, the proper inquiry requires an examination of defendants' representations, taken together and in context" and "[t]hus, when an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate." *Id*. at *13 (quoting *Lindsay v. Morgan Stanley*, 592 F.3d 347, 366 (2d. Cir. 2010)); *see also Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010) ("The veracity of a statement or omission is measured not be its literal truth, but by its ability to accurately inform rather than mislead prospective buyers."). The *Panther* court was persuaded that a "reasonable investor reading about 'media speculation' that the PRC might 'impose new regulations[']" could be misled about the regulatory landscape. *Id*. at *16. So too here.

Defendants' statements omitted the PRC's regulations and their impact on the company's business and compliance costs. By writing "[i]n countries and regions with anti-LGBTQ public policies or negative sentiment toward the LGBTQ community but same-sex relationships are not

12

explicitly illegal, governmental authorities generally have discretion to block LGBTQ platforms on broad moral grounds," and then immediately referring to an incident that occurred in Indonesia in 2018, BlueCity suggested that this disclosure referred only to peripheral markets.  However, BlueCity's home market that contributed substantially all its revenues is certainly a country were "same-sex relationships are not explicitly illegal" but has "negative sentiment toward the LGBTQ community" and where the Government has "discretion to block LGBTQ platforms on moral grounds."  Thus, the state of the regulatory environment was far worse han represented.

Numerous other holdings are in accord.  *See In re Facebook Inc*., 986 F. Supp. 2d 487, 516 (2d Cir. 2013) ("Courts in this Circuit have held that a company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized."); *see also In re Am. Int'l Grp. Inc.*, *2008 Secs. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010) ("[G]eneric risk disclosures are inadequate to shield defendants from liability for failing to disclose known specific risks."); *In re Bear Stearns ERISA Litig.*, 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011) ("Warnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described.").[3]

Defendant's reliance on the very same statements that Plaintiffs allege are misleading concerning the PRC Government's regulations (Mot. at 20-23) is misplaced because an issuer that "is aware of an actual danger or cause for concern … may not rely on a generic disclaimer in order

---

[3] Plaintiffs do not need to plead scienter under Section 11, but "must 'plead facts to demonstrate that the allegedly omitted facts both existed and were known or knowable at the time of the offering.'" *Panther* 2020 WL 5757628 *8, (quoting *In re Tuckcell Iletism Hizmetler A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 12 (S.D.N.Y. 2001) & *Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 421 (S.D.N.Y. 2008)). The severity of the regulations and their impact on the company's compliance costs were likely known and certainly knowable by Defendant given the prominence of the PRC's regulations, BlueCity's reaction to these regulations, and the climate where other LGBTQ apps in China were shut down for violating the PRC's regulations.

to avoid liability." *In re iDreamSky Tech. Ltd. Sec. Litig.*, 236 F. Supp. 3d 830, 831 (S.D.N.Y. 2017) (citations omitted). "[W]hen an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be 'complete and accurate.'" *Id*. at 830 (internal quotations omitted).[4] Defendant's generic disclosures of hypothetical risks from the PRC's regulations omitted to state other facts necessary to make the statements therein not misleading. *See also* 17 C.F.R. §229.105 (requiring "discussion of the material factors that make an investment in the registrant or offering speculative or risky").

### 2.    Statements Concerning BlueCity's Products and Services (AC ¶¶115-129)

Plaintiffs allege that BlueCity misled investors about the company's products and services at the time of the IPO. Defendant dissects multiple statements that Plaintiffs allege are misleading into isolated parts and argues that these fragments only amount to "semantic disputes," "unsupported claims," or "conclusory assertions." Mot at 1, 13-20. However, statements must be read together and in context to determine if they would have misled a reasonable investor. *See Meyer,* 761 F.3d at 250-251. In context, it was misleading for Defendants to suggest that BlueCity's path to profitability was its membership services (¶¶115-121), that the company was able to diversify its products and services (¶¶122-123), and that BluedBaby had shown early success (¶¶125-128).

First, Plaintiffs alleged that Defendant misled investors about *Blued* membership services. BlueCity in part owed its survival to the fact that it was able to distinguish itself from other dating apps that had been shut down. *See supra* Section I, B. Adopting a membership services model that

---

[4] Defendant also argues that any alleged misrepresentations were immaterial, citing *Singh v. Schikan*, 106 F. Supp 3d 439, 446 (S.D.N.Y. 2015). Unlike Plaintiffs in *Schikan*, who did not dispute that details of the enrollment criteria for different pharmaceutical studies were disclosed in the Registration Statement, here Plaintiffs have pointed to critical details about the PRC's regulations that were not disclosed.

would allow users to pay for subscription-based and pay-per-use services to "Spotlight," "Boost, and "Super Like" profiles could never have been the path to profitability that the company claimed. Like it did with other design features, the Company copied its membership services model from Tinder. *See* ¶¶53, 121. By emphasizing the dating component of the platform and expanding into membership services, BlueCity made itself like *Zank* (an app with 10 million users) and other apps that were shut down for violating the PRC's regulations on LGBTQ content. *See* ¶¶63-64, 121. This created a risk to BlueCity in two ways: increased compliance costs and the possibility it would be shut down. *See* ¶121. BlueCity knew this and investors did not. Therefore, it was misleading at the time of the IPO to suggest that membership service would positively affect the company's results of operations and profitability.

Second, Plaintiffs allege that BlueCity misled investors by stating that it would diversify its products and services without disclosing that this would be limited to the healthcare space. ¶123. Defendant argues that this statement about diversification was literally true because the company began to offer premium live-streaming content and different advertising forms. Mot. at 16. However, these are not new types of products or services that would diversify BlueCity's offerings. Defendant maintains that this is an immaterial semantic dispute, however, with competing interpretations of the meaning of "diversify" in this context, this raises a fact intensive inquiry that should not be decided on a motion to dismiss. Whether or not the trier of fact determines these statements about BlueCity's ability to diversify its products and services were literally true, the fact that Defendant did not disclose that this was limited to unprofitable and low margin health related services renders the statements misleading. BlueCity knew it could only diversify within the healthcare space and investors did not. Therefore, it was misleading to suggest that diversification would positively affect the BlueCity's results of operations and profitability.

15

One such service was BluedBaby. *See supra* Section I, B.  BlueCity stated that its "new businesses have shown considerable early success with significant monetization upside" and specifically hyped BluedBaby. ¶¶124-125. The Prospectus named this service as one of BlueCity's primary businesses. Pr. at 3. However, Defendant had no basis for these statements. At the time of the IPO, BluedBaby was languishing at 2% of revenues and after three years had yet to make any user a new parent. ¶127.  These allegations are bolstered by the Defendant's later admission that the business had never gained "great traction." ¶128. It was misleading at the time of the IPO to suggest that this service had "early success." BlueCity knew the service had not led anyone to parenthood, investors did not. Therefore, it was misleading at the time of the IPO to suggest that BluedBaby had "early success" and "monetization upside."

### 3. Defendant Violated Its Duty to Disclose Uncertainties and Risks in Violation of Item 105 and 303 of Regulation S-K

Defendant had an affirmative disclosure obligation under Items 105 and 303 of Regulation S-K, which govern the preparation of the Offering Documents. ¶¶ 138-143.  *See Panther*, 2020 WL 5757628, at *7 (quoting 15 U.S.C. § 77k); *Litwin*, 634 F. at 715; *Y-Gar Cap. LLC v. Credit Suisse Grp. AG*, 2020 WL 71163, at *9 (S.D.N.Y. Jan. 2, 2020) ("Failure to make disclosure in accordance with [Items 105 and 303] can serve as the basis of a claim under Section 11[.]").

First, Item 303 required BlueCity to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have material . . . impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii).  "The same facts underlying an Item 303 violation may also support an Item [105] violation, and a court's rationale for determining the former may also support the determination of the latter." *In re Barclays Bank PLC Sec. Litig.*, 2017 WL 4082305, at *9 (S.D.N.Y. Sep. 13, 2017).   Second, Item 105 "requires

offering documents to include a 'discussion of the most significant factors that make the offering speculative or risky' and 'how the risk affects the issuer or the securities being offered.'" *Id*.

Here, Defendants failed to disclose uncertainties and risks that were known to them at the time of the IPO, including the trend that the PRC's regulations on LGBTQ content had tightened to the point that, at the time of the IPO, simply displaying LGBTQ content was considered obscene and subject to Government sanction. BlueCity downplayed the severity of the PRC's regulations and consequentially failed to warn of their impact on BlueCity's business and compliance costs.[5]

Defendants provided a generic warning about governments having discretion to block their app and specifically advised investors that LGBTQ apps, including *Blued*, had been blocked in Indonesia. There is no mention of the PRC's draconian regulations surrounding LGBTQ content and that 18 of BlueCity's competitors had been removed from app stores in China for violating them. BlueCity chose to warn of 2019 regulations requiring them to "establish or improve their internal policies in relation to . . . scrutiny of information publication." Mot. 7. The Prospectus acknowledged that this covered "content prohibited to be broadcasted, such as violence, pornography, gambling, terrorism, and other illegal or immoral content." Pr.at 32. However, this failed to mention the PRC's regulations that prohibited LGBTQ content as objectionable. "[C]ase law does not support the sweeping proposition that an issuer of securities is never required to disclose publicly available information." *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC,* 709 F.3d 109, 127 (2d Cir. 2013) (quoting *Litwin v. Blackstone Grp.,*

---

[5] Defendant's reliance on *Willard* is inapposite as the disclosures at issue in that case included specific data showing trading volume in consecutive quarters that did not suggest growth was "consistent and predictable," which Plaintiff claimed was misleading. *Willard v. Up Fintech Hldgs. Ltd.,* 527 F. Supp 3d 609, 622 (S.D.N.Y. 2021). Here, Plaintiffs have alleged that the disclosures were not "complete and accurate" because they failed to inform investors that LGBTQ content was *per se* "objectionable," amongst other things. *iDreamSky,* 236 F. Supp. 3d 830

17

*L.P.,* 634 F.3d 706, 718 (2d Cir. 2011)); *see also In re Enzymotec,* 2015 WL 8784065, at *15 (D.N.J. Dec. 14, 2015) (motion to dismiss denied where defendants asserted that new Chinese regulations were publicly known as evidenced through articles, government reports and even analyst reports because "to prevail on this theory, Defendants would have to show that the market understood the regulations' implications, which is a fact question not properly addressed at this stage.").[6]

Plaintiffs have alleged that the stringency of these regulations presented known uncertainties and risks.  Defendant was required to disclose these known uncertainties and risks because they were reasonably likely to materially affect BlueCity's business and financial condition or make an investment in its ADS "speculative or risky"—as Items 303 and 105 require. *See Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016) (requiring disclosure even if company "was uncertain about [an issue's] likely effect on . . . current and future revenues"); *Litwin*, 634 F.3d at 719 (requiring disclosure of "manner in which" issues could affect revenues).

These allegations suffice to state a claim. In *Yi Xiang v. Inovalon Holdings, Inc.*, plaintiff alleged that "the State of New York had already changed its tax laws by the time of the company's IPO and that 'it was widely expected' that New York City would soon follow suit."  The court found that "[e]ven if Defendants were not certain about the likely effect of the tax law changes on their future revenues, Defendants were still 'required under Item 303 to disclose the manner in

---

[6] Defendant's arguments that they did not violate these regulations because the PRC's policies were in the public domain fail. The cases cited in support of Defendant's position involve disclosures that are more obviously accessible than the relatively obscure disclosures at issue here. *In re Bank of Am AIG Disclosure Sec. Litig.*, 980 F. Supp 2d 564, 576 (S.D.N.Y. 2013) (finding no omissions where the allegedly concealed information had been reported in major news outlets such as The New York Times and The Wall Street Journal).  Defendant's reliance on *Keyspan* is similarly misplaced as it does not involve Section 11 claims and relates to the "specific context of public utilities" and information relating to the effects of the regulatory process on their business. *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003).

18

which that then-known trend, event, or uncertainty might reasonably be expected to materially impact [the company's] future revenues.'" 254 F. Supp. 3d 635, 644 (S.D.N.Y. 2017) (citing *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016)). *See also Panther*, 681 F. 3d at 122 (finding that "generic cautionary language," as at issue here, "did not fulfill [the issuers'] duty to inform the investing public of the particular, fact-based uncertainties of which it was aware in the weeks leading up to the … [o]ffering"); *Litwin*, 643 F.3d at 718 (duty to disclose where "the key information that plaintiffs assert should have been disclosed is whether, and to what extent, the particular known trend, event or uncertainty might have been reasonably expected to materially affect" the Company's revenues and operations).

Here, Plaintiffs allege that at the time of the IPO, it had become *per se* illegal for BlueCity to explicitly allow LGBTQ content to be shared on its platform—let alone say "gay" or "LGBTQ." Given the PRC's regulations on obscenity, which lump homosexuality in with sexual abuse and sexual violence constituting an "abnormal sexual relationship," and ban stories, images, and references to homosexuality online (which date back years before the IPO), and when considered alongside the 2019 regulation requiring BlueCity to improve their internal controls to detect "obscene content" or face sanctions, this tightening of restrictions certainly qualifies as a "known trend, event or uncertainty." The consequences, ranging from increased compliance costs (which the Defendant downplayed) to being blocked form the Chinese market, would "have a material impact" on BlueCity's financial condition and operations, and therefore warranted disclosure.

Collectively, Defendant's disclosures did not come anywhere close to conveying the undisclosed risk to investors from the PRC Government's regulations. *See In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (the securities laws do not protect someone who "warns his hiking companion to walk slowly because there might be a ditch

19

ahead when he knows with near certainty that the Grand Canyon lies one foot away."). Accordingly, Defendant violated Items 105 and 303. As a result, Plaintiffs have stated a claim pursuant to Section 11 and the motion to dismiss should be denied for this independent reason.

**C.      Defendants Did Not Disclose, and Plaintiffs Did Not Know About, the PRC's Tightening Restrictions on LGBTQ Content in China and Their Effect on BlueCity's Business**

BlueCity tries to escape liability for its deficient disclosures by claiming that the PRC Government's crackdown on LGBTQ content online was public knowledge. *See* Mot. at 7, 11-13. BlueCity is wrong and, in fact, does not rely on a single case. *See id*. Rather, knowledge of how a foreign government's tightening restrictions would impact a foreign company's business prospects cannot be attributed to investors in an offering directed at American investors. Certainly not in a Section 11 case, and most certainly not on a motion to dismiss.

It would be fundamentally unfair and contrary to the purpose of Section 11 to allow Defendants to direct an IPO at investors in the United States and then argue that shareholders' claims fail because that which the Prospectus failed to disclose was public knowledge in China. "The [Securities Act's] 'fundamental purpose *** was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry.'" *Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544, 563 (E.D.N.Y. 1971). Moreover, BlueCity's Offering Documents specifically told investors not to rely on information that was different from what was presented in the Offering Documents. ¶137.

In *Horowitz v. Sunlands Tech. Grp.*, Defendants made a similar argument, claiming that American investors should have been aware of events giving rise to their Section 11 claim based on news that had been reported in the Chinese press. 2021 WL 1224517, at *2 (E.D.N.Y. Mar.

20

31, 2021) (Block, J.).  This Court rejected the argument, which the Court recognized was premature at the motion to dismiss stage.  *See id.; see also In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 438 (S.D.N.Y. 2009) ("The Court finds that the publication of three newspaper articles—in Chinese—does not transform the information contained within the articles into 'matters of general public knowledge' that may properly be imputed to Fuwei's stockholders." (emphasis added)); *In re China Mobile Games & Entm't Grp., Ltd Sec. Litig.*, No. 14-CV-4471 (KMW), 2016 WL 922711, at *9 (S.D.N.Y. Mar. 7, 2016) (holding that information was not "publicly available" because it contained "information requiring travel to China, communicating in Chinese, reading signs in Chinese, and translating financial filings in Chinese.").  That reasoning applies here, where the Complaint specifically includes the allegation that the English-language Prospectus put forth a materially different picture than the Chinese version of Blued.  *See* ¶¶7, 61, 96-97.[7]

**D.     The "Bespeaks Caution Doctrine" Does Not Apply Here.**

Defendant argues generally that the alleged misstatements are protected by the bespeaks caution doctrine, but only specifically claims that the following is a protected forward-looking statement: "we expect revenues generated from our recently launched membership services will grow quickly." Mot. at 13-15. Defendant ignores the limitations of the bespeaks caution doctrine. First, to gain protection under this doctrine, the cautionary language contained within the disclosure must, when examined in context, "warn[ ] of the specific contingency that lies at the heart of the alleged misrepresentation." *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d

---

[7] BlueCity's claim that "Plaintiff fails to plead [] that a single crackdown-related event was not *public*", Mot. at 7 (emphasis in original), also fails because, as discussed in connection with Item 303, BlueCity was required to disclose how a trend – *even if in the public domain* – is likely to affect its performance. *See Litwin*, 634 F.3d at 721 (Item 303 required Blackstone to disclose downward trend in U.S. real-estate market, and how that known trend would reasonably be expected to affect its business, in connection with its 2007 IPO).

Cir. 2004). Second, "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has [already] transpired." *Meyer*, 761 F.3d at 251 (citation omitted). Third, the bespeaks caution doctrine extends only to forward-looking statements, not to "misrepresentation[s] of present or historical facts." *P. Stolz*, 355 F.3d at 96–97; *see In re Enzymotec*, 2015 WL 8784065, at *11 (D.N.J. Dec. 14, 2015) (finding that statements about progress such as "well positioned for future growth" and "achieving rapid penetration" were actionable because they related to "then-existing conditions as opposed to future projections.").

First, there were simply no reasonable grounds to believe that membership services would supply quickly growing revenues in a political climate where nearly all LGBTQ dating apps had been shut down by the PRC. This is an especially important point, as Plaintiffs have alleged (and Defendant does not dispute) that the success of the IPO depended on demonstrating to investors that BlueCity other paths to profitability.

Second, Defendant fails to identify adequate cautionary language to address the risks posed by pursuing membership services. Defendant claims that "Plaintiff fails…to show any actual investor was instantly reminded of Tinder." Mot. at 15. However, they acknowledge that the Oppenheimer Report directly compared BlueCity's membership services to Tinder's. *Id.*; ¶119. Plaintiffs have alleged (and Defendant does not dispute) that BlueCity downplayed its dating app component to evade the scrutiny from the PRC Government that led to rivals being shut down. ¶120. Encouraging Tinder-style membership-services would, at a best, increase the cost of compliance with PRC regulations and, at worst, cause BlueCity to go out of business.

Furthermore, Defendants identify just one arguably forward-looking clause within a section of the Prospectus that is otherwise squarely in the present tense. The sentence followed a chart with Blued's Monthly Activity User statistics and the section addressing the monetization of

22

their userbase. Pr. at 90. The paragraph also discusses the ways that BlueCity generated revenue at the time of the IPO, which were "then-existing conditions as opposed to future projections." 2015 WL 8784065, at *11; Pr. at 90 ("We generate revenue primarily through [listed activities] …Our revenues and results of operations depend on our ability monetize our userbase").

**E.      The Statements Identified by Plaintiffs are Not Nonactionable Puffery.**

Defendant claims that the statements identified by Plaintiffs are nonactionable puffery. "Statements are not puffery if shareholders could reasonably interpret them as material misstatements." *Gross v. GFI Grp., Inc.*, 162 F. Supp. 3d 263, 268–69 (S.D.N.Y. 2016). As explained above, each misstatement or omission could reasonably be interpreted as misleading, particularly on a motion to dismiss where all inferences must be drawn in Plaintiffs' favor.

**F.      Plaintiffs Adequately Allege A Section 15 Claim.**

In a footnote, BlueCity points out that there can be no Section 15 liability if there is no primary violation of the Securities Act. Mot. at 24, n.25. Because Plaintiffs' primary claim is adequately alleged, this argument fails. Plaintiffs have pleaded a Section 15 Claim against the Individual Defendants, including Defendant Colleen De Vries, as explained further in Plaintiffs' Memorandum of Law in Opposition to the Cogency Defendants' Joinder.

**G.      Plaintiffs Have Not Waived Their Right to a Jury Trial.**

Defendant asserts that Plaintiffs and the Class waived their Constitutional right to a jury trial simply because the BlueCity ADS Agreement said so. Mot. at 24-25. However, the law states that such a waiver is enforceable only "if it is made knowingly, intentionally, and voluntarily." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 188 (2d Cir. 2007) (citations omitted). "The burden of proving that a waiver was knowing and intentional rests with the party attempting to enforce the purported waiver." *Lehman Bros. Holdings v. Bethany*

23

*Holdings Grp.*, 801 F. Supp. 2d 224, 229 (S.D.N.Y. 2011) (quotations omitted). BlueCity acknowledged this in its Prospectus, which states that "[i]n determining whether to enforce a contractual pre-dispute jury trial waiver provision, courts will generally consider whether a party knowingly, intelligently and voluntarily waived the right to a jury trial." *See* Pr. at 69-70. Defendant offers no facts suggesting that Plaintiffs "knowingly, intelligently and voluntarily" waived this right. Defendant also offers no caselaw to support the proposition that an unsigned agreement contained in a Prospectus that incorporates by reference another document signed only by third parties (here, BlueCity and a Deutsche Bank entity) constitutes a "knowing[], intelligent[] and voluntary[y]" waiver. Accordingly, Defendant cannot enforce this jury trial waiver.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motions to dismiss in their entirety.[8]

Dated: November 1, 2022                  Respectfully submitted,

                                         **LEVI & KORSINSKY, LLP**

                                         By: */s/ Nicholas Porritt*
                                         Nicholas I. Porritt (NP-5961)
                                         Max E. Weiss (MW-6697)
                                         55 Broadway, 10th Floor
                                         New York, NY 10006
                                         Tel: (212) 363-7500
                                         Fax: (212) 363-7171
                                         Email: nporritt@zlk.com
                                         Email: mweiss@zlk.com

---

[8] In the alternative, Plaintiffs' respectfully request leave to amend. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 189-90 (2d Cir. 2015) (leave to amend proper following benefit of ruling on pleadings).

24

-and-

**THE ROSEN LAW FIRM, P.A.**

By: _/s/ Phillip Kim_
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
Michael Cohen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: mcohen@rosenlegal.com

_Co-Counsel for Lead Plaintiffs and the Class_

25

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 1, 2022, a true and correct copy of the foregoing document was served electronically on all parties, to be filed by the moving party when the motion has been fully briefed, in accordance with Rule 2(D) of the Court's Individual Motion Practices and Rules.

<u>*/s/ Max Weiss*</u>

26