UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
JUNHUI JIANG, individually and on
behalf of all others similarly situated,

            Plaintiff,

  -against-

BLUECITY HOLDINGS LIMITED,
BAOLI MA, ZHIYONG (BEN) LI, ZHE
WEI, WEI YING, COLLEEN A. DE
VRIES, AMTD GLOBAL MARKETS
LIMITED, LOOP CAPITAL
MARKETS LLC, TIGER BROKERS
(NZ) LIMITED, PRIME NUMBER
CAPITAL LLC, R.F. LAFFERTY &
CO., INC., and COGENCY GLOBAL,
INC.,

            Defendants.
------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. 21-CV-4044-FB-CLP

*Appearances:*
*For the Plaintiff:*
NICHOLAS I. PORRITT
MAX E. WEISS
Levi & Korsinsky, LLP
55 Broadway, 10th Floor
New York, New York 10006

*For Defendant BlueCity Holdings:*
MICHAEL B. CARLINSKY
XIAO LIU
JACOB J. WALDMAN
JIANJIAN YE
Quinn Emanuel Urquhart & Sullivan
51 Madison Avenue, 22nd Floor
New York, New York 10010

*For Defendants Colleen A, DeVries
and Cogency Global, Inc.*:
JOANNA A. DIAKOS
K&L Gates LLP
599 Lexington Avenue
New York, New York 10022

**BLOCK, Senior District Judge:**

In this class action under the Securities Act of 1933, the plaintiff alleges that documents issued in connection with the initial public offering ("IPO") of shares in defendant BlueCity Holdings Limited ("BlueCity") contained false and misleading statements. Of the thirteen defendants, three—Blue City, Cogency Global, Inc. ("Cogency"), and Colleen A. DeVries—have moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] For the following reasons, the motion is granted.

## I

The following facts are drawn from the amended complaint and the SEC filings and other documents upon which it relies. The allegations of the amended complaint are taken as true and in the light most favorable to the plaintiff "unless conclusory or contradicted by more specific allegations or documentary evidence." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 149 n.1 (2d Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009), and *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).

BlueCity operates an online platform for LGBTQ users in Asia. Founded in 2011 by defendant Baoli Ma (also known as "Geng Le"), BlueCity also offers a

---

[1] It appears that the remaining defendants have not yet been served.

smartphone-based dating app—"Blued"—that caters to the LGBTQ community.

More than 90% of BlueCity's revenues come from China, a market whose government has an uneven track record towards LGBTQ individuals. Although homosexual activity is not criminalized, same-sex couples cannot marry or adopt. Sex-reassignment surgery is available but highly restricted; identifying as transgender is still considered a mental disorder. Reflecting that ambivalent attitude, a previous LGBTQ online platform hosted by Geng Le was shut by the Chinese government several times.

China's attitude towards LGBTQ issues is reflected in its censorship laws. In 2016 the Chinese government began to include gay content in what it considered "vulgar, immoral and unhealthy content" in television and online media. Am. Compl. ¶ 66. A year later the China Netcasting Services Association ("CNSA") issued a regulation defining gay content as "vulgar," "obscene," and "pornographic," placing it in the same category as incest, sexual abuse and rape. *Id.* ¶ 72. Pursuant to this change in policy, the government shut down thousands of websites and blogs, and dozens of internet platforms and smartphone apps, including "Zank" and "Rela," two of the most popular LGBTQ dating sites in China, and "Peepla," a popular livestreaming app known for its gay content.

By its own admission, BlueCity works "cautiously" in the current political

3

environment in China. Am. Compl. ¶ 55. It has made several changes to its business since 2016 and 2017. On its public-facing materials, it has removed words like *gay* and its Chinese equivalent (*tongzhi*) and emphasized its health promotion activities (such as AIDS/HIV prevention). What it once described as the "biggest gay portal website for Chinese people" is now the "World's Leading Interest-Based Social & Health Education Network." *Id.* ¶¶ 92, 94. It continues to operate a livestreaming platform (which accounted for approximately 85% of its revenue in 2020) but has restricted the permissible content to exclude content that might be questioned by the government. It devotes roughly 25% of its workforce to a "censorship division" that monitors all content—twenty-four hours a day, seven days a week—and imposes account suspensions and other penalties on users who do not abide by the restrictions.

These steps allowed BlueCity to survive the "gay purge" and, indeed, to make efforts to attract international investment. On July 8, 2020, it offered 5.3 million American Depository Shares on NASDAQ. The registration statement and prospectus accompanying the IPO included the following statement about BlueCity's business model:

> We generate revenue primarily through (i) live streaming services, (ii) membership services, (iii) advertising services, and (iv) others including family planning services and health-related services. . . . Our revenues and results of operations depend on our ability to

> monetize our user base, to convert more users to paying users and to increase the spending of our paying users. . . . Currently, revenues generated from live streaming is the largest component of our revenues, and we expect revenues generated from our recently launched membership services will grow quickly.

Am. Compl. ¶ 115 (emphasis omitted).

The registration statement and prospectus also described BlueCity's expansion plans:

> We will continue to diversify our product and service offerings and expand our monetization channels without compromising user experience.
>
> Following the success of our live streaming services, we launched multiple new businesses, which have shown considerable early success with significant monetization upside.

*Id.* ¶ 122, 124 (emphasis omitted). Specifically, the company touted "Bluedbaby," a family-planning consultation service. The prospectus stated that the service "was launched in 2017 to provide users with personalized assisted reproduction consultation services, making the pursuit of parenthood a smoother journey for them." *Id.* ¶ 125. BlueCity monetized the service by "collect[ing] consulting service fees from customers of our family planning service." *Id.* ¶ 126.

Finally, the registration statement and prospectus contained a disclaimer about the risks of focusing on the LGBTQ market in certain countries:

> Currently, our mobile app Blued is available in certain countries and regions with anti-LGBTQ public policies, negative cultural, social or

5

> religious sentiment toward the LGBTQ community, and where homosexuality is illegal. Legal consequences for same-sex activities and relationships in countries and regions where same-sex relationships are illegal vary depending on the local law, with the most severe being the death penalty. In countries and regions with anti-LGBTQ public policies or negative sentiment toward the LGBTQ community but same-sex relationships are not explicitly illegal, governmental authorities generally have discretion to block LGBTQ platforms on broad moral grounds. For example, in early 2018, dozens of apps for the LGBTQ community, including Blued, were blocked by the Google app store upon the request of the Indonesian government. Finally, while we do not expect that any government that permits us to carry on our business activities will reverse that policy, we cannot guarantee that we will continue to be able to provide our services in any jurisdiction where we currently have legal authority to do so.

*Id.* ¶ 130. The documents included a specific disclaimer about China:

> The PRC [People's Republic of China] government and regulatory authorities have adopted regulations scrutinizing videos, audio and other content on the internet. Under these regulations, internet content providers are prohibited from posting or displaying internet content that, among other things, violates PRC laws and regulations, impairs the national dignity of China or the public interest, or is obscene, superstitious, fraudulent, violent or defamatory. . . .
>
> In January 2019, CNSA issued the Censoring Criteria for Network Short Video Content, which set forth certain details of content prohibited to be broadcasted, such as violence, pornography, gambling, terrorism, and other illegal or immoral content. The enactment of these regulations may significantly increase our compliance costs in recruiting additional content reviewers and training them to identify content violations timely and accurately. . . .
>
> Failure to identify and prevent illegal or inappropriate content from being uploaded on our platform may subject us to liability. To the extent that PRC regulatory authorities find any content on our

> platform objectionable, they may require us to limit or eliminate the dissemination of such content on our platform in the form of take-down orders, or cause our app to be removed from app stores.

*Id.* ¶ 133 (emphases omitted).

At the time of the IPO, BlueCity's share price was $16.00. A little over a year later, it was trading at $7.04/share. This lawsuit predictably followed.[2]

## II

### A. Legal Standards

Section 11 of the Securities Acts of 1933 creates civil liability if a publicly traded company's registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 12(a)(2) creates a parallel liability for statements contained in a publicly traded company's prospectus. *See id.* § 77*l*(a)(2). Section 11's liability is imposed on anyone signing the statement, as well as the company's directors and underwriters, *see id.* § 77k(a)(1-2, 5), while section 12's is imposed on sellers of the company's stock, *see id.* § 77*l*(a)(2). Section 15 makes "controlling persons" jointly and severally liable with primary violators. *See id.* § 77o(a).

---

[2] BlueCity was later acquired by a private company. Its shares ceased public trading on August 12, 2022.

Unlike claims under section 10(b) of the Securities Exchange Act of 1934, "[n]either scienter, reliance, nor loss causation is an element of § 11 or § 12(a)(2) claims which—unless they are premised on allegations of fraud—need not satisfy the heightened particularity requirements of [Federal] Rule [of Civil Procedure] 9(b)." *NECA-IBEW Health & Welfare Fund*, 693 F.3d at 156-57.  In an attempt to subject the plaintiff to these more stringent pleading standards, the defendants argue that the claims in this case sound in fraud.  Their argument, however, is based on an isolated allegation that BlueCity timed its IPO "in an attempt to cash out before it was too late." Am. Compl. ¶ 127.  The Court does not read that allegation to imply that every allegedly false statement in the registration statement and prospectus was made with an intent to deceive and, therefore, applies the usual standard of "ordinary notice pleading." *NECA-IBEW Health & Welfare Fund*, 693 F.3d at 157 (internal quotation marks omitted).  Under that standard, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

Thus, the central issue is whether the registration statement and prospectus for BlueCity's IPO contained "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a

material omission of information that is necessary to prevent existing disclosures from being misleading." *Litwin v. Blackstone Gp., L.P.*, 634 F.3d 706, 715-16 (2d Cir. 2011). Materiality in this context means "a substantial likelihood that the disclosure of [the truth or] the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (internal quotation marks omitted). "[A]s a general matter, the total mix of information may include information already in the public domain and facts known or reasonably available to potential investors." *Litwin*, 634 F.3d at 718 (internal quotation marks and alterations omitted).

**B.     Application**

The plaintiff's overarching theory is that BlueCity's registration statement and prospectus violated sections 11 and 12(a)(2) because they "painted a misleadingly rosy picture of BlueCity's business prospects as a gay dating app based in China." Am. Compl. ¶ 5. At that level of generality, however, China's attitude on LGBTQ issues was sufficiently well-known to make it part of the "total mix of information" that a reasonable potential investor in BlueCity would have been aware of in 2020. *See, e.g.,* C. Shepherd, *China LGBT community fears crackdown after Weibo content vanishes*, Financial Times, Apr. 15, 2019 ("China's censorship of LGBTQ

9

content will be ever more strict this year compared to last year."); Yuan Yang, *China's gay scene attracts censorship and investment*, Financial Times, Feb. 9, 2017 ("While apps serving LGBT people are attracting the investment of entertainment firms, they are still often censored on China's entertainment platforms."). To avoid that obstacle, the plaintiff argues (A) that three specific statements in BlueCity's registration statement and prospectus were misleading in light of the crackdown on gay content in China and (B) that, regardless of any connection to statements in those documents, BlueCity had an affirmative obligation to disclose the effect of the crackdown on its business prospects. The Court addresses those arguments in turn.

### 1. *Specific Statements*

The plaintiff first cites BlueCity's statement that "we expect revenues generated from our recently launched membership services will grow quickly." Am. Compl. ¶ 115 (emphasis omitted). Although the figures are not cited in the complaint, the prospectus itself reflects such an increase between 2018 and the time of the IPO;[3] other SEC filings show that revenues from membership services

---

[3] The plaintiff quibbles that the membership services were not "recently launched" because Blued itself was launched in 2012. The registration statement and prospectus however, specify which paid services were under discussion and nothing contradicts the representation that those services were launched in 2018.

10

continued to increase after the IPO. Thus, the statement is literally true.

The plaintiff argues that the statement misleadingly implies that the increased revenues would translate into increased *profits*. Although the statement does not mention profitability, investors obviously expect their investments to turn a profit, and there is some merit in the argument that increased revenues suggest what the plaintiff calls a "path to profitability." Problematically for this argument, however, profit projections (and, for that matter, revenue projections) are "forward-looking statement[s]." 15 U.S.C. § 78u-5(i)(1). Such a statement is shielded from liability if it is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *Id.* § 77z-2 (c)(1)(A)(i).

The statement at issue here is expressly framed as an "expect[ation]" and accompanied by all the usual disclaimers about factors that can have a negative impact on a company's prospects. *See Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 578 (S.D.N.Y. 2018), *aff'd sub nom. Arkansas Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019) ("On several occasions, Xerox officers made statements articulating the expectation that . . . the company's Service business would become profitable.

11

These forward-looking statements, however, are clearly non-actionable, as they were accompanied by meaningful cautionary language.").

In response, the plaintiff argues that BlueCity was trying to market itself as the Chinese version of Tinder without disclosing the specific risks of that strategy. While is it true that the registration statement did not specifically mention China's crackdown on gay content or its effect on other dating apps like Zank and Rela, this was all public knowledge at the time of the IPO:

> But since 2016, as part of a cultural crackdown on "vulgar, immoral and unhealthy content" — which includes everything from hip-hop music to tattoos — China's state regulators have banned portrayals of "abnormal sexual relations" in television, including same-sex relationships. Popular Chinese shows with gay story lines were removed from screening sites. One gay-dating app, Zank, was shut down by the government, and a lesbian-dating app, Rela, disappeared shortly after.

Yi-Ling Liu, *How a Dating App Helped a Generation of Chinese Come Out of the Closet*, N.Y.T. Magazine, Mar. 8, 2020, at 26; *see also* Kayleen Devlin & Vincent Ni, *Chinese gay video ban sparks online backlash*, https://www.bbc.com/news/blogs-trending-40610679 (July 16, 2017); *Popular Chinese lesbian dating app removed from internet*, https://www.reuters.com/article/us-china-lgbt/popular-chinese-lesbian-dating-app-removed-from-internet-idUSKBN18P15G (May 29, 2017). One major outlet even laid out the potential impact of the crackdown on Blued:

> Blued is in a peculiar position: It might be the biggest app of its kind, yet it is also the most precarious. It is a tech company in a society that has been transformed by free-market reforms, but also a gay tech company operating under a one-party government with an ambiguous stance toward L.G.B.T.Q. issues that has been tightening its grip in recent years on civil-society and minority groups all across China."

Yi-Ling Liu, *supra*, at 26.

The plaintiff next cites BlueCity's statement that it would "continue to diversify our product and service offerings and expand our monetization channels without compromising user experience." Am. Compl. ¶ 122. The Court agrees with the defendants that the statement—which is essentially generic marketing jargon—is too vague to constitute a representation of fact. It is, however, followed by (slightly) more concrete references to "multiple new businesses, which have shown considerable early success." *Id.* ¶ 124 (emphasis omitted). The plaintiff focuses on BlueCity's family-planning service and the fact that it had not placed a single baby in its first three years of operation. In context, however, the registration statement and prospectus explained that Bluedbaby was one of its "other" businesses and accurately represented its small share of the company's revenues. Moreover, it accurately explained that those revenues came from consulting fees without suggesting any sort of contingency arrangement based on a successful placement. Overall, the documents conveyed enough correct information to allow potential investors to make their own assessment of the

13

service's level of success.

Finally, the plaintiff cites BlueCity's general and China-specific disclaimers about the risks of doing business in the LGBTQ market in certain countries. The general disclaimer clearly informs potential investors that "governmental authorities generally have discretion to block LGBTQ platforms on broad moral grounds" and that "we cannot guarantee that we will continue to be able to provide our services in any jurisdiction where we currently have legal authority to do so." Am. Compl. ¶ 130. The China-specific disclaimer references the ban on "violence, pornography, gambling, terrorism, and other illegal or immoral content," and notes that the ban "may significantly increase our compliance costs in recruiting additional content reviewers and training them to identify content violations timely and accurately" or "may subject us to liability" for noncompliance. *Id.* ¶ 133 (emphasis omitted).

Notwithstanding these warnings, the plaintiffs argue that the disclaimers are misleading because they do not inform potential investors that the Chinese government deemed all gay content objectionable and shut down many websites and apps for noncompliance. The Court agrees that mentioning the Indonesian government's effort to block gay dating apps without also mentioning China's

action is at least superficially puzzling.[4] However, the public availability of both pieces of information again leads the Court to conclude that the disclaimers did not mislead potential investors by altering the "total mix" of information available to them from all sources.

### 2. *Failure to Disclose*

As noted, even if the omission of a fact does not render another statement misleading, it can still be actionable if there is an affirmative duty to disclose. In that regard, Item 303 of SEC Regulation S-K requires registration statements to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). The objective of the requirement is to give potential investors information "specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." *Litwin*, 634 F.3d at 716 (quoting instructions to the regulation).

---

[4]The defendants note that Blued was subject to the Indonesian government's decision, but that the Chinese government has not taken any adverse action against the company. The Court expresses no opinion as to whether that justifies omitting China's action against other sites.

The Court agrees that, based on the facts as alleged in the amended complaint, the attitude of the Chinese government towards LGBTQ content on the internet constitutes a trend that was both known to BlueCity and that was likely to have an unfavorable impact on its operations. Once again, however, that trend was a matter of public knowledge.

As the plaintiff correctly points out, awareness of a government policy does not necessarily translate into knowledge of its effect on a particular business or industry. In this case, the plaintiff posits two potential impacts. First, the ban on gay content created the risk that the Chinese government would shut down content providers that flouted the ban. To the extent that risk was not self-evident, it was demonstrated by the government's widely publicized actions against other sites like Zank and Rela.

Second, to avoid being shut down, companies may have had to take additional measures to make sure they complied with the ban. This could lead to increased costs, which could in turn affect a company's profitability. The Court agrees that the nature of these risks is not as obvious and may, in appropriate circumstances, require a company to explain how a government policy might impact its bottom line. But BlueCity did just that when it disclosed that the crackdown could lead to increased costs in the form of hiring and training

16

employees to monitor its content.

## III

In sum, the Court concludes that the information contained in BlueCity's registration statement and prospectus, supplemented by information that was publicly available, painted an accurate picture of the risks of catering to the LGBTQ market in China. Accordingly, the defendants' motion to dismiss is granted and the amended complaint is dismissed.

**SO ORDERED.**

    /S/ Frederic Block_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
August 22, 2023